# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 6, 2009　　　　　Decided June 2, 2009

No. 07-5195

PETER JAMES ATHERTON,
APPELLANT

v.

DISTRICT OF COLUMBIA OFFICE OF THE MAYOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 04cv00680)

*Sarah Campbell*, Student Counsel, argued the cause as *amicus curiae* in support of appellant. With her on the briefs were *James E. Coleman, Jr.*, appointed by the court, *Sean E. Andrussier*, Attorney, and *James McDonald*, *Eugenie Montague*, *Emily Sauter*, and *Eric Wiener*, Student Counsel.

*Peter J. Atherton*, *Pro Se*, was on the briefs for appellant.

*Judith A. Kidwell*, Assistant U.S. Attorney, argued the cause for Federal Appellees. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

*Richard S. Love*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees Suzanne Bailey-Jones, et al. With him on

the brief were *Peter J. Nickles*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

Before: KAVANAUGH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: On April 9, 2001, appellant Peter James Atherton was sworn in as a District of Columbia Superior Court grand juror. The grand jury was scheduled to deliberate for 25 days. However, on April 11, Atherton was permanently removed from grand jury service after an Assistant United States Attorney ("AUSA") who was presenting evidence to the grand jurors reported to the supervising AUSA, Daniel Zachem, that the jurors were complaining about Atherton. After meeting with members of the grand jury, Zachem contacted the Director of Special Operations at the Superior Court, Roy Wynn, who directed him to juror officer Suzanne Bailey-Jones. Zachem discussed the matter with Bailey-Jones and then returned to the jury room, confiscated Atherton's notes, and directed him to report to the Juror Office. Bailey-Jones then summarily and permanently removed Atherton from the grand jury for being "disruptive." Atherton was never given a written explanation for his removal from the grand jury, and he was not afforded a hearing before any court official or judge.

In April 2004, Atherton filed a *pro se* complaint in the District Court, contending that he was unlawfully removed from grand jury service because of his deliberative judgments and his Hispanic ethnicity. Atherton's complaint named Bailey-Jones, Wynn, Zachem, and several other city and federal officials, as well as the District of Columbia and the Department of Justice Office of the Attorney General. The complaint alleged

constitutional violations of due process and equal protection against the District of Columbia ("District") defendants and the federal defendants, citing 42 U.S.C. §§ 1983, 1985(3), 1986, and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), as well as a common law fraud claim.

The District Court granted the District and federal defendants' motions to dismiss the complaint for failure to state a claim. *Atherton v. District of Columbia Office of the Mayor, et al.*, No. 04-0680, 2007 WL 1041659 (D.D.C. Apr. 5, 2007). The District Court first found that Atherton had failed to allege that any defendants other than Bailey-Jones and Zachem were directly involved in his dismissal, and that Atherton had not stated a claim for municipal liability against the District of Columbia. The court also dismissed the §§ 1985(3) and 1986 claims, and found that the fraud claim against Zachem was barred by sovereign immunity. Finding that Atherton's allegations did not support any personal involvement by Wynn in the decision to remove Atherton from the grand jury, the District Court dismissed the equal protection and due process claims against Wynn on the ground that Atherton had failed to state claims upon which relief may be granted. Although the District Court found that Atherton had stated claims against Bailey-Jones and Zachem for due process and equal protection violations, these claims were dismissed on the ground that Bailey-Jones and Zachem were entitled to absolute immunity. Atherton, with the able support of appointed *amicus curiae*, now seeks reversal of the District Court's judgment.

We reverse the District Court's dismissal of the due process claims against Bailey-Jones and Zachem. The District Court erred in holding that Bailey-Jones and Zachem enjoy absolute immunity for the removal of a grand juror. We will remand the case to allow the District Court to assess whether Bailey-Jones and Zachem are protected by qualified immunity. We affirm the

District Court's dismissal of Atherton's equal protection and § 1985(3) claims, and his due process claim against Wynn, because the complaint and supporting submissions fail to state causes of action. We affirm the District Court's dismissal of all remaining claims.

## I. BACKGROUND

### A. *Facts*

On review of a motion to dismiss, we "treat the complaint's factual allegations as true . . . and must grant [Atherton] the benefit of all inferences that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (quotation marks and citation omitted). The facts recited below are drawn from the complaint and from additional materials submitted by Atherton, including affidavits and exhibits incorporated therein. The parties do not dispute that these documents may be considered for the purposes of this appeal. *See Amicus* Br. at 3 n.1; D.C. Br. at 4 n.2; *Greenhill v. Spellings*, 482 F.3d 569, 572 (D.C. Cir. 2007) (noting courts may "consider supplemental material filed by a pro se litigant in order to clarify the precise claims being urged"); *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) ("In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice.").

### 1. *Atherton's Complaint*

Atherton is a D.C. resident with degrees in electrical and nuclear engineering. Compl. ¶¶ 1, 68. On April 9, 2001, he was sworn in as a D.C. Superior Court grand juror for a term scheduled to last 25 days. *Id.* ¶¶ 1, 16. However, on April 11, 2001, Atherton was permanently removed from the grand jury. *Id.* ¶¶ 22-24.

Atherton and the grand jurors with whom he served were given jury instruction books identifying crimes and their elements. Atherton believed that some of the cases for which indictments were being sought included alleged crimes which were not in the instruction book. *Id.* ¶ 18. Concerned that grand jurors had voted to indict without knowing the elements of the crimes, Atherton requested additional information from an AUSA on the elements of crimes that were not contained in the instruction book. *Id.* ¶¶ 18-19. Some jurors "seemed upset" because they had voted to indict without knowledge of the elements "and a new vote would be needed once the elements of the charge were known." *Id.* ¶ 20. Atherton "felt a hostile attitude from a few members of the jury when there was continuing rebuttal to every comment [he] made concerning deliberation on elements of crimes." *Id.* ¶ 66.

Atherton also felt that his fellow grand jurors reacted negatively to his Hispanic ethnicity. At one point during their deliberations, the grand jury was considering a homicide case involving an altercation between black and Hispanic individuals. After a Hispanic witness had finished testifying, Atherton thanked the witness in Spanish. Atherton subsequently perceived hostility from other grand jurors based on this incident. *Id.* ¶¶ 64-67. He is half Mexican and "was the only semi-fluent [S]panish speaking grand juror." *Id*. ¶ 67.

During the course of grand jury deliberations on April 11, 2001, supervising AUSA Zachem entered the jury room where the grand jurors were deliberating, confiscated Atherton's notes, and directed Atherton to immediately report to Wynn's office. *Id*. ¶ 23-24. Atherton went to Wynn's office as he had been instructed. *Id.* Atherton was then directed to Bailey-Jones, who "permanently dismissed" him. *Id*. ¶ 24. Atherton "was never permitted the opportunity to defend himself," *id*. ¶ 28, and Bailey-Jones did not provide reasons for his dismissal, other than that he was allegedly "disruptive." *Id.* ¶ 24. Atherton

asked for a written explanation and Bailey-Jones assented to this request. However, written notice was never given. *Id*. ¶¶ 28, 44. "Atherton left feeling very humiliated, embar[r]assed and questioning his self worth, and did not return to grand jury duty." *Id*. ¶ 27.

2. *Additional Materials Submitted by Atherton in Support of His Complaint*

The record before the District Court includes a copy of an email that Zachem wrote to Bailey-Jones the day after Atherton's removal. *See* Email from Dan Zachem to Suzanne Bailey-Jones (Apr. 12, 2001), *reprinted in* Joint Appendix ("J.A.") 61-62 ("Zachem email"). According to Zachem's account, an AUSA who was presenting evidence to the grand jury informed Zachem that some of the grand jurors had requested to see a supervisor about a "scientist" who was frustrating his colleagues. *Id*., J.A. 61. The email states:

> [T]he AUSA reported that "the scientist" was desirous of additional written materials, including additional jury instructions and code provisions, and these requests, in conjunction with extensive questioning of both prosecutor and witness alike, [were] clearly agitating other members of the grand jury. Efforts were made to satisfy the requests of "the scientist" by, for example, providing xerox copies of several code provisions, but these efforts proved unsuccessful in mollifying his concerns. At approximately 3:00 p.m., Deputy Chief Dan Zachem was informed by the AUSA that the grand jury was demanding to see a supervisor "immediately.". . . Thereafter, behind closed doors, on the record and in the presence of the scientist, several grand jurors, no fewer than 5-6 in number, expressed the view that a single grand jury member was frustrating the grand jury's ability to conduct business. More specifically, these grand jurors, who were not contradicted by any of their number, expressed in emotional

terms their belief that the offending grand juror was "either unwilling or unable to follow the rules" regarding, among other things, the burden of proof, an orderly deliberative process and voting.

*Id*.

Zachem's email states further that he spoke briefly to defendant Roy Wynn in the D.C. Superior Court Juror's Office, and that Wynn directed him to defendant Bailey-Jones. *Id*. Zachem acknowledged that he did "not think it appropriate for the US Attorney's Office . . . to take a position with respect to the removal of a particular juror from service." *Id*., J.A 62. But he added: "I am entirely confident in reporting, however, that based upon my observations, if [Atherton] was permitted to remain, that [the] Grand Jury . . . would not have been able to discharge its function." *Id*.

In addition to Zachem's email, the District Court record also includes a copy of Superior Court rules covering the removal of grand jurors. These rules, which were in effect when Atherton was removed from grand jury service, stated:

(g) Discharge and excuse.

A grand jury ordered by the Superior Court shall serve until discharged by the Chief Judge or other judge designated by the Chief Judge; but no grand jury may serve more than 18 months unless the Chief Judge or designee extends the service of the grand jury for a period of 6 months or less upon a determination that such extension is in the public interest. *At any time for cause shown, the Chief Judge or other judge designated by the Chief Judge may excuse a juror either temporarily or permanently,* and in the latter event the Chief Judge or designee may impanel another person in place of the juror excused.

D.C. Sup. Ct. R. Crim. P. 6(g) (emphasis added). Rufus G. King III, the Chief Judge of the Superior Court during the relevant time, submitted an affidavit stating that he "was never contacted by anyone from the Court's jury office or the U.S. Attorney's office before or at the time of the removal of grand juror Atherton." Affidavit of Rufus G. King III, J.A. 83. The affidavit also states that "[t]he practice then in place did not include contacting the chief judge before a grand juror was involuntarily dismissed. . . . I [later] changed the procedures to require that I be consulted before imposition of any grand jury discipline." *Id.*, J.A. 84.

## B. *Proceedings Before the District Court*

Atherton alleges that as a result of the defendants' conduct, he was denied the right to complete his service on the grand jury and suffered humiliation, embarrassment, emotional trauma, and injury to his reputation. Compl. ¶¶ 27, 80. He commenced a *pro se* action in the District Court in April 2004, naming as defendants the District of Columbia Office of the Mayor, the Superior Court Office of the Clerk, Superior Court Clerk Duane Delaney, Director of Special Operations Division Roy Wynn, Juror Officer Suzanne Bailey-Jones, the Department of Justice Office of the Attorney General, and Assistant United States Attorney Daniel M. Zachem. The District Court substituted the District of Columbia as the proper defendant for the Office of the Mayor and the Superior Court Clerk's Office. *Atherton*, 2007 WL 1041659, at *1 n.1. The complaint alleged civil rights violations under 42 U.S.C. §§ 1983, 1985(3), and 1986, and *Bivens*, 403 U.S. 388, as well as a common law fraud claim. Atherton asked for "actual damages equal to the amount of money he would have earned had he completed his 25 day jury service," as well as punitive damages. Compl. ¶ 79.

The District Court initially dismissed the case *sua sponte* for lack of subject matter jurisdiction. On June 21, 2005, this court reversed and remanded the case to the District Court.

*Atherton v. District of Columbia Office of the Mayor, et al.,* No. 04-5268 (D.C. Cir. June 21, 2005) (Order). Beginning in September 2006, defendants filed motions to dismiss and to quash service.

In an opinion issued on April 5, 2007, the District Court granted the defendants' motions to dismiss. *Atherton*, 2007 WL 1041659. The District Court first rejected the defendants' claims of improper service and statute of limitations bar as grounds for dismissal. *Id*. at *2. The Court then held, without explanation, that the complaint provided no basis for § 1985(3) liability, and that the § 1986 claim was time-barred. *Id*. at *3.

The District Court dismissed the official capacity claims brought under § 1983 against the municipality of D.C. on the ground that juror officer Bailey-Jones was acting outside the scope of her authority when she removed Atherton from the grand jury, *id*. at *5, and dismissed the individual capacity claims against supervisors Delaney and Wynn on the ground that the allegations did not support any personal involvement by these defendants in the decision to remove Atherton from the grand jury, *id*. at *3. The District Court declined to exercise supplemental jurisdiction over the fraud claim alleged against Wynn and Delaney. *Id*. at *3 n.2.

As for the fraud claim against Zachem, the District Court held that Atherton did not allege sufficient facts to rebut the government's certification that Zachem was acting within the scope of his employment, so the Federal Torts Claim Act was the exclusive remedy for the fraud claim and the United States was substituted as the defendant. Because the United States is exempt from liability based on "[a]ny claim arising out of . . . misrepresentation [or] deceit," 28 U.S.C. § 2680(h), the fraud claim was barred by sovereign immunity. *Id*. at *7.

The District Court found that Atherton had stated viable claims against both Bailey-Jones and Zachem for deprivation of

a liberty interest without due process and denial of equal protection. However, the District Court held that both defendants were entitled to absolute immunity and dismissed the § 1983 and *Bivens* claims against these defendants.

Atherton appealed the District Court's judgment dismissing his case. This court then appointed Professor James E. Coleman, Jr., of the Duke University School of Law, as *amicus curiae* to present arguments in favor of appellant ("*Amicus*"). *Atherton v. District of Columbia Office of the Mayor, et al.,* No. 07-5195 (D.C. Cir. Sept. 24, 2008) (Order). Professor Coleman was assisted by Sean E. Andrussier and third-year law students Sarah Campbell, James McDonald, Eugenie Montague, Emily Sauter, and Eric Wiener in Duke's Appellate Litigation Clinic. Sarah Campbell did a fine job in representing Atherton during oral arguments before this court.

## II. ANALYSIS

### A. *Standard of Review*

We review a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) *de novo.* *See Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1108 (D.C. Cir. 2008). A plaintiff's complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to survive a motion to dismiss. Fed. R. Civ. P. 8(a)(2). A complaint must give the defendants notice of the claims and the grounds upon which they rest, but "[s]pecific facts are not necessary." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 551 U.S. at 94 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)) (other citations omitted). A court may not grant a motion to dismiss for failure to state a claim "even if it strikes a savvy judge that . . . recovery

is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks and citation omitted). "So long as the pleadings suggest a 'plausible' scenario to 'sho[w] that the pleader is entitled to relief,' a court may not dismiss." *Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009) (quoting *Twombly*, 550 U.S. at 557). However, the Supreme Court recently made it clear that,

> [w]here the claim is invidious discrimination . . . the plaintiff must plead . . . that the defendant acted with discriminatory purpose. Under extant precedent purposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action "because of," not merely "in spite of," [the action's] adverse effects upon an identifiable group.

*Ashcroft v. Iqbal*, No. 07-1015, ___ U.S. ___, slip op. at 12 (U.S. May 18, 2009) (internal quotation marks and citations omitted). This means that,

> [t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Id*. at 14 (internal quotation marks and citations omitted).

A *pro se* complaint, such as Atherton's, "must be held to less stringent standards than formal pleadings drafted by

lawyers." *Erickson*, 551 U.S. at 94 (internal quotation marks and citation omitted). But even a *pro se* complainant must plead "factual matter" that permits the court to infer "more than the mere possibility of misconduct." *Iqbal*, slip op. at 15.

## B.  *Absolute Immunity*

When government "officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct.  In this way, exposing government officials to the same legal hazards faced by other citizens may detract from the rule of law instead of contributing to it."  *Forrester v. White*, 484 U.S. 219, 223 (1988).  Because "the nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have," judges are protected by absolute judicial immunity.  *Id*. at 226.  As the Court made clear in *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335 (1871), judges "are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly."  *Id*. at 351.  "If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication."  *Forrester*, 484 U.S. at 226-27 (citation omitted).  However, as a general matter, the Supreme Court has "been quite sparing in its recognition of claims to absolute official immunity," to ensure against extending "the scope of the protection further than its purposes require."  *Id*. at 224.

Judicial immunity from liability, as with absolute immunity in other contexts, "is justified and defined by the *functions* it

protects and serves, not by the person to whom it attaches." *Id.* at 227. In other words, "Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities." *Butz v. Economou*, 438 U.S. 478, 511 (1978). It is therefore unsurprising that absolute immunity has been extended to cover executive branch officials who perform either quasi-judicial functions that are "'functionally comparable' to th[ose] of a judge," *id.* at 513 (citing hearing examiners and administrative law judges), or prosecutorial functions "intimately associated with the judicial phase of the criminal process," *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).

The courts have continued to apply "a 'functional' approach to immunity questions other than those that have been decided by express constitutional or statutory enactment." *Forrester*, 484 U.S. at 224. Following this approach, absolute immunity has been granted to a court-appointed mediator or neutral case evaluator, performing tasks within the scope of his official duties, *Wagshal v. Foster*, 28 F.3d 1249 (D.C. Cir. 1994); clerks of the court accused of issuing a false order against a *pro se* plaintiff barring his access to the court, *Sindram v. Suda*, 986 F.2d 1459 (D.C. Cir. 1993); probation officers alleged to have improperly investigated and prepared a presentence report, *Turner v. Barry*, 856 F.2d 1539 (D.C. Cir. 1988); and a court-appointed committee monitoring the unauthorized practice of law, *Simons v. Bellinger*, 643 F.2d 774 (D.C. Cir. 1980). However, absolute immunity has been rejected for judges acting in an administrative capacity, *Forrester*, 484 U.S. at 229; court reporters charged with creating a verbatim transcript of trial proceedings, *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993); prosecutors providing legal advice to the police, *Burns v. Reed*, 500 U.S. 478, 492-96 (1991); and a judge engaged in the selection of jurors, *Ex Parte Virginia*, 100 U.S. 339 (1879).

14

As this court noted in *Wagshal*, "[w]e have distilled the Supreme Court's [functional] approach to quasi-judicial immunity into a consideration of three main factors." *Wagshal*, 28 F.3d at 1252. These factors include:

> (1) whether the functions of the official in question are comparable to those of a judge; (2) whether the nature of the controversy is intense enough that future harassment or intimidation by litigants is a realistic prospect; and (3) whether the system contains safeguards which are adequate to justify dispensing with private damage suits to control unconstitutional conduct.

*Id.* (citing *Butz*, 438 U.S. at 512) (other citation omitted).

"The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties." *Imbler*, 424 U.S. at 422-23 (footnote omitted). Like judicial immunity, absolute prosecutorial immunity turns on the function performed by the prosecutor. Absolute immunity is granted only for conduct "intimately associated with the judicial phase of the criminal process." *Id.* at 430. Thus, courts look to whether the particular activity in dispute was performed by a prosecutor in his or her official capacity as an advocate for the state in the course of judicial proceedings. *See Kalina v. Fletcher*, 522 U.S. 118, 125 (1997). A prosecutor is not entitled to absolute immunity when performing "administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns*, 500 U.S. at 486. "The presumption is that qualified rather than absolute immunity is sufficient to protect

government officials in the exercise of their duties." *Id*. at 486-87. For the reasons explained below, we hold that neither Bailey-Jones nor Zachem is entitled to absolute immunity from liability on the due process and equal protection claims raised by Atherton. The issues in this case are distinct from – and thus do not require us to decide – questions concerning whether judges and prosecutors have absolute immunity for exercising or ruling on peremptory challenges or challenges for cause at trial.

1. *Juror Officer Bailey-Jones is Not Entitled to Quasi-Judicial Immunity*

The District argues that Bailey-Jones is entitled to absolute immunity because, as a juror officer of the Superior Court, she performed tasks "'that are basic and integral parts of the judicial function . . . .'" D.C. Br. at 9 (quoting *Sindram*, 986 F.2d at 1461). We disagree.

Bailey-Jones's act of dismissing Atherton from the grand jury was not an exercise of a judicial function, nor was it "integrally related to adjudication." *Wagshal*, 28 F.3d at 1253. She was not involved in the resolution of any factual or legal issue; and her responsibilities did not involve handling any pleadings, disputes, or controversies of law. In fact, Bailey-Jones's role in Atherton's dismissal was entirely removed from the adjudicative context. The juror officer is primarily responsible for administrative tasks, such as determining the number of jurors needed by the Superior Court each day, managing the computer systems and equipment for the Juror's Office, and overseeing juror orientation and the administration of the oath for jurors. *See* Juror Officer Job Description, J.A. 71-76. The juror officer also "[r]eviews written requests for juror excuses or deferrals" and grants or denies such requests "in conformity with policies established by the court." *Id.*, J.A. 72. These administrative and managerial activities, even if essential to the smooth and efficient functioning of Superior Court operations, are not functions that justify the application of quasi-

judicial immunity. "[T]he touchstone for the . . . applicability [of judicial immunity] has been performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights. When judicial immunity is extended to officials other than judges, it is because their judgments are functionally comparable to those of judges – that is, because they, too, exercise a discretionary judgment as a part of their function." *Antoine*, 508 U.S. at 435-36 (internal quotation marks and citations omitted).

The District concedes that Bailey-Jones was performing an administrative act when she dismissed Atherton, but is nonetheless entitled to absolute immunity because her actions were "taken in furtherance of a judicial function." D.C. Br. at 10. This argument fails. The "functional approach" does not allow for the extension of absolute immunity merely because a public official performs an act that is arguably "part of the judicial function." *Antoine*, 508 U.S. at 435 (rejecting the claim that absolute immunity should be extended to court reporters). Indeed, certain activities performed by public officials may be "quite important in providing the necessary conditions of a sound adjudicative system," but remain "not themselves judicial or adjudicative" in nature. *Forrester*, 484 U.S. at 229.

Moreover, Bailey-Jones's argument that she is entitled to absolute immunity cannot be reconciled with *Ex Parte Virginia*, 100 U.S. 339. In that case, the Supreme Court held that a judge's selection and exclusion of persons for jury service was not a judicial function entitled to absolute immunity. The Court held:

> Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. . . . [I]t surely is not a judicial act, in any

such sense as is contended for here. It is merely a ministerial act . . . . That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, sheriffs, &c. Is their election or their appointment a judicial act?

*Id.* at 348.

*Ex Parte Virginia* was cited with approval in *Forrester*, where the Court stated that "[a]dministrative decisions, even though they may be essential to the very functioning of the courts, have not . . . been regarded as judicial acts." *Forrester*, 484 U.S. at 228. The *Forrester* Court went on to say:

In *Ex parte Virginia*, 100 U.S. 339 (1880), for example, this Court declined to extend immunity to a county judge who had been charged in a criminal indictment with discriminating on the basis of race in selecting trial jurors for the county's courts.

. . . .

Although [*Ex Parte Virginia*] involved a criminal charge against a Judge, the reach of the Court's analysis was not in any obvious way confined by that circumstance.

*Forrester*, 484 U.S. at 228.

The District attempts to distinguish *Ex Parte Virginia*, claiming that it involved "the ministerial act of drawing up a list of potential jurors, which could have been done by anyone," while in this case "Bailey-Jones had to decide whether or not to excuse Mr. Atherton based on his reported disruptive behavior, an act which . . . was solely entrusted to the Court." D.C. Br. at 12 n.6. This contention has no merit. Whether an act is "solely entrusted to the Court" is not the test to determine whether it is a "judicial function" for purposes of absolute immunity. The court reporter in *Antoine* was engaged in acts solely entrusted to the court, but those acts did not entitle the court reporter to absolute immunity.

In assessing Bailey-Jones's claim for absolute immunity, we must also consider "whether the nature of the controversy is intense enough that future harassment or intimidation by litigants is a realistic prospect." *Wagshal*, 28 F.3d at 1252. It is arguably conceivable that the threat of litigation might inhibit a juror officer's ability to make some decisions necessary for the "smooth operation" of grand jury proceedings. But the District concedes that the need to excuse a juror rarely arises. D.C. Br. at 13. Therefore, there is no evidence in this case that rejecting absolute immunity will impede independent and responsible decisionmaking by juror officers in the future. *See Antoine*, 508 U.S. at 437 ("Respondents have not provided us with empirical evidence demonstrating the existence of any significant volume of vexatious and burdensome actions against reporters . . . ."). Furthermore, qualified immunity should more than suffice to protect juror officers and other like public officials in the Superior Court. *See Cleavinger v. Saxner*, 474 U.S. 193, 207-08 (1985).

Finally, we must assess "whether the system contains safeguards which are adequate to justify dispensing with private damage suits to control unconstitutional conduct." *Wagshal*, 28 F.3d at 1252. In *Butz,* the Supreme Court noted:

> [T]he safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of

cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.

438 U.S. at 512. There were no such "safeguards" available to Atherton when he was summarily dismissed from grand jury service.

In sum, it is clear that Bailey-Jones was performing administrative/managerial functions when she dismissed Atherton from the Superior Court grand jury. The District has failed to meet its burden to show that the acts performed by Bailey-Jones were quasi-judicial functions that were functionally comparable to those of a judge. Therefore, the District Court erred in dismissing Atherton's claims against Bailey-Jones on the ground that she is entitled to absolute immunity.

## 2. *Supervising AUSA Zachem is Not Entitled to Absolute Prosecutorial Immunity*

Unlike Bailey-Jones, who is employed by the District of Columbia, Zachem is a federal employee. However, "the law of immunity in a *Bivens* claim against a federal official mirrors that in a section 1983 claim against a state official." *Moore v. Valder*, 65 F.3d 189, 192 (D.C. Cir. 1995) (citing *Butz*, 438 U.S. at 504). Absolute prosecutorial immunity, like judicial immunity, turns on the function performed by the prosecutor. And not all work done by prosecutors is covered by absolute immunity. *See Kalina*, 522 U.S. at 125 (noting that absolute immunity does not encompass some of the official activities of a prosecutor).

As noted above, prosecutors are entitled to absolute immunity for conduct "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. The

Supreme Court has explained that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which *occur in the course of his role as an advocate for the State*, are entitled to the protections of absolute immunity." *Kalina*, 522 U.S. at 126 (citing *Buckley*, 509 U.S. at 273) (emphasis added). But "the defense [is] unavailable when the prosecutor was performing a different function." *Id.* (citing prosecutors' provision of legal advice to the police during their pretrial investigation of the facts, holding a press conference, and allegedly fabricating evidence concerning an unsolved crime as acts that are not covered by prosecutorial immunity).

In this case, Zachem is alleged to have procured or participated in the unlawful removal of a sworn grand juror. His conduct certainly was not "intimately associated with the judicial phase of the criminal process." And it surely did not "occur in the course of his role as an advocate for the State." Indeed, Zachem's conduct was not comparable to any of the advocative functions for which prosecutors traditionally have been protected by absolute immunity: His role in Atherton's dismissal from the grand jury was not related to a decision whether to prosecute an individual, *Imbler*, 424 U.S. 409; it did not involve his participation in a probable cause hearing, *Burns*, 500 U.S. 478; it was not a presentation of the state's case at trial, *see Buckley*, 509 U.S. at 273; and it did not concern the evaluation or selection of evidence for presentation to a grand jury, *Kalina*, 522 U.S. 118.

Simply because a prosecutor's conduct is connected with the grand jury does not make it advocatory. Prosecutorial immunity undoubtedly may extend to cover prosecutors' conduct before grand juries, *see, e.g.*, *Burns*, 500 U.S. at 490 (noting immunity at common law extended to prosecutors participating in "any hearing before a tribunal which performed a judicial function") (quotation marks and citation omitted); *id.*

at 490 n.6 (citing cases involving grand juries). In this case, however, Zachem was not the AUSA who was presenting evidence to the grand jury. He was the supervising AUSA who was called in to address complaints raised by members of the grand jury who were allegedly annoyed with Atherton's behavior during grand jury deliberations. Indeed, Zachem acknowledged that he did "not think it appropriate for the US Attorney's Office . . . to take a position with respect to the removal of a particular juror from service," Zachem email, J.A 62, so he knew that his involvement had nothing to do with his advocatory duties as a prosecutor. Atherton's dismissal could have been performed by *anyone*. It had nothing to do with Zachem's advocatory functions.

This determination is not inconsistent with the Supreme Court's recent decision in *Van de Kamp v. Goldstein*, 129 S. Ct. 855 (2009), where the Court held that administrative activities conducted by a supervising prosecutor which were "directly connected with the prosecutor's basic trial advocacy duties" may be protected by absolute immunity. *Id*. at 863. *Van de Kamp* involved a lawsuit by a criminal defendant, who alleged, among other things, that the supervising prosecutor's failure to train and supervise attorneys under his charge resulted in a prosecutor improperly withholding impeachment evidence which deprived the defendant of a fair trial. The principal claim in the case was the alleged withholding of trial evidence, a claim with respect to which prosecutors have long enjoyed the protection of absolute immunity. The Supreme Court held that it would be anomalous to deny immunity to a supervising prosecutor for failure to train when the trial prosecutor – whose "error in the plaintiff's specific criminal trial constitutes an essential element of the plaintiff's claim" – would be entitled to absolute immunity protection. *Id*. at 862. It is plain that the Court's analysis in *Van de Kamp* is inapposite here. In this case, Zachem's alleged activities – improperly removing a grand juror on the basis of his ethnicity and/or for the content and quality of his

deliberations – had nothing to do with a prosecutor's preparation for or participation in a criminal trial.

In sum, Zachem is not entitled to absolute immunity because the activities for which he is being sued do not relate to his performance as an advocate for the government. As discussed above in relation to Bailey-Jones, the final two factors of the immunity inquiry, *see Wagshal*, 28 F.3d at 1252, do not change this outcome. Zachem did not demonstrate that "the nature of the controversy is intense enough that future harassment or intimidation by litigants is a realistic prospect," *id.*, and the absence of safeguards in this case counsels against extending absolute immunity to those involved.

## C. *Atherton's Equal Protection Claims: §§ 1983 and 1985(3)*

The District Court found that Atherton's complaint and supporting submissions viably stated claims of equal protection violations by Bailey-Jones and Zachem. Atherton's right not to be excluded from a grand jury on the basis of race or ethnicity was clearly established when he was dismissed from the Superior Court grand jury. *See Carter v. Jury Comm'n of Greene County*, 396 U.S. 320, 329 (1970) (noting that "[p]eople excluded from juries because of their race are as much aggrieved as those indicted and tried by juries chosen under a system of racial exclusion"); *Campbell v. Louisiana*, 523 U.S. 392, 398 (1998) (stating that there is a well-established equal protection right not to be excluded from grand jury service on the basis of race). Appellees do not contest this point. Rather, appellees contend that Atherton failed to state claims under the equal protection clause against Bailey-Jones and Zachem. We agree.

The only factual allegations in Atherton's complaint on his equal protection claim are that: (1) after a witness who could not speak English testified before the grand jury, Atherton openly thanked the witness in Spanish, Compl. ¶¶ 64-65; (2)

"based on information, Atherton was the only semi-fluent Spanish speaking grand juror," *id*. at ¶ 67; and (3) Atherton is "half Mexican," *id*. From these facts, Atherton alleges that, "based upon information," his removal without cause from the grand jury was an act of discrimination against him "and Hispanics in particular because there were no other Hispanics on the jury." *Id*. at ¶ 73. He also alleges that the defendants conspired to illegally remove him from the grand jury "for ethnic purposes." *Id*. at ¶ 68. These spare facts and allegations are not enough to survive a motion to dismiss under *Iqbal* and *Twombly*. The complaint and supporting materials simply do "not permit the court to infer more than the mere possibility of misconduct," *Iqbal*, slip op. at 15, and this is insufficient to show that Atherton is entitled to relief. *See* FED. R. CIV. P. 8(a)(2). As the Court noted in *Iqbal*, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, slip op. at 14 (internal quotation marks and citation omitted). We therefore reverse the District Court's finding that Atherton stated claims of equal protection violations by Bailey-Jones and Zachem.

Atherton's claims under § 1985(3) fare no better. Section 1985(3) provides a cause of action against two or more persons who participate in a conspiracy motivated by class-based discriminatory animus. 42 U.S.C. § 1985(3); *see also Griffin v. Breckenridge*, 403 U.S. 88, 96-102 (1971) (examining the meaning of § 1985(3)). To state a claim under § 1985(3), Atherton was required to allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, . . . and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in her person or property or deprived of any right or privilege of a citizen of the United States.

*Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987) (alteration in original). "The statute does not apply to *all* conspiratorial tortious interferences with the rights of others, but only those motivated by some class-based, invidiously discriminatory animus." *Id*. (internal quotation marks and citation omitted).

Atherton's complaint and supporting materials merely allege that Zachem, Bailey-Jones, and Wynn communicated about his removal before he was dismissed from the grand jury. *See* Zachem email, J.A. 61-62. These bare facts clearly do not raise an inference that Zachem, Bailey-Jones, and Wynn were conspiratorially motivated by some class-based, invidiously discriminatory animus. The complaint also asserts that the defendants "conspired under color of law to illegally remove Atherton . . . for ethnic purposes," Compl. ¶ 68, and that Atherton was illegally removed from the grand jury in violation of the Constitution and D.C. law. But these "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a cause of action under § 1985(3). *Iqbal*, slip op. at 14. We therefore affirm the District Court's dismissal of Atherton's § 1985(3) claims.

**D. *Atherton's Due Process Claims and Qualified Immunity***

Although government officials may be sued in their individual capacities for damages under § 1983 and *Bivens*, qualified immunity protects officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When determining whether a right was "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The District Court did not decide whether Bailey-Jones or Zachem are entitled to qualified immunity

Traditionally, courts have approached the qualified immunity analysis through a two-step inquiry mandated in *Saucier v. Katz*, 533 U.S. 194 (2001), asking, first, whether the alleged facts show that the individual's conduct violated a statutory or constitutional right, and, second, whether that right was clearly established at the time of the incident. *Id.* at 200. However, the Supreme Court recently announced that the *Saucier* protocol "should no longer be regarded as mandatory." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Rather, a district court judge now retains discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Whether the defendants in this case are entitled to qualified immunity on the due process claim is a challenging question. Atherton alleges he was denied due process in violation of the Fifth Amendment of the Constitution. *See Butera v. District of Columbia*, 235 F.3d 637, 645 n.7 (1987) (explaining that while due process violations are typically analyzed under the Fourteenth Amendment, the District of Columbia – which is not a state – is subject to the Due Process Clause of the Fifth Amendment). The Fifth Amendment Due Process Clause protects individuals from deprivations of "life, liberty, or property, without due process of law." U.S. Const. amend. V. A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections. Liberty interests may either be located in the Constitution itself or "may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). "State regulations may give rise to a constitutionally protected liberty interest if they contain substantive limitations on official discretion, embodied in mandatory statutory or regulatory language." *See Price v. Barry*, 53 F.3d 369, 370 (D.C. Cir.

1995) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989)).

Although the District Court found that there was a liberty interest in grand jury service, the court did not explain the source of the liberty interest, its parameters, or the particular portions of Atherton's allegations which stated a due process claim. Much hinges on these determinations, because the qualified immunity analysis "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson*, 483 U.S. at 639. The Supreme Court has explained:

> For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading.

*Id.*; *see also Butera*, 235 F.3d at 646. The Court has cautioned, however, that "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640 (internal citation omitted).

*Amicus*, on behalf of Atherton, argues that D.C. law limits official discretion to remove a sworn grand juror and pointed to several possible sources of the liberty interest. For example, the D.C. Superior Court Rules of Criminal Procedure provide that a grand juror may be dismissed at any time by the Chief Judge, or another appointed judge, *for cause shown*. D.C. Sup. Ct. R. Crim. P. 6(g) (emphasis added). Additionally, counsel for the District agreed at oral argument that a juror has a recognized interest in not being dismissed because of his or her "views on the merits" and that this right was clearly established under D.C. law; but he argued that Atherton's complaint does not advance the claim. Whether this or any other source of District of Columbia law creates a liberty or property interest is a matter that must be addressed by the District Court on remand.

As noted above, the District Court retains the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first" – (1) whether the alleged facts show that the officials' conduct violated a statutory or constitutional right and (2) whether that right was clearly established at the time of the incident – "in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

"Once it is determined that due process applies, the question remains what process is due." *FDIC v. Mallen*, 486 U.S. 230, 240 (1988) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "[A] fundamental requirement of due process is the opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (internal quotation marks and citation omitted). "In determining whether due process requirements have been satisfied – whether an appropriate hearing has been provided at a meaningful time and in a meaningful matter – a court should consider: [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of

such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Garraghty v. Va. Dep't of Corr.*, 52 F.3d 1274, 1282 (4th Cir. 1995) (citing the Supreme Court's seminal decision in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). It is not always clear, however, whether and to what extent a predeprivation hearing is required or whether a post-deprivation hearing will suffice. *See, e.g.*, *Mallen*, 486 U.S. at 240. Furthermore, whether it be pre- or post-deprivation, "[t]he question of 'what process is due' is more easily asked than answered." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998).

In assessing a qualified immunity defense to a due process claim, a court invariably must consider the context and weigh the *Mathews* factors. And

> notwithstanding the fact that procedural due process rights oftentimes will not be "clearly established" within the meaning of *Harlow* and *Anderson*, [a court] must consider the specific facts of [the] case to determine whether it presents one of those occasions in which the rights are clearly established. The question presented therefore boils down to this: Has [the complainant] proven that, under the three-part balancing analysis of *Mathews* and the precedents that have applied it, he had a "clearly established" right to process more comprehensive than that provided by the District?

*Brewster*, 149 F.3d at 984.

In this case, it is possible that any constitutionally required process may be found in the law that gives content to the liberty interest. In other words, the process required by the substantive

law may coincide with the constitutional minimum. For example, D.C. Superior Court Rule of Criminal Procedure 6(g) prescribes a procedure to be followed when persons are removed from jury service: a juror may only be removed by the Chief Judge or another appointed judge for cause shown. Atherton alleges that he was deprived of even this process.

Because the qualified immunity issue was not addressed below and was only thinly briefed on appeal, we are not in a position to address the questions that remain to be answered here. We will leave it to the District Court on remand to consider these matters.

## E. *The Claims Against the District of Columbia*

Finally, we affirm the District Court's dismissal of the § 1983 claims against the District of Columbia. "Under § 1983 a municipality is liable not under principles of *respondeat superior*, but only for constitutional torts arising from 'action pursuant to official municipal policy.'" *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Iqbal*, slip op. at 11-12. The facts alleged by Atherton do not support an inference of a course the city's "policymakers consciously chose to pursue." *Triplett*, 108 F.3d at 1453.

## III. CONCLUSION

The judgment of the District Court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.