# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 4, 2014          Decided May 15, 2015

No. 12-5322

OSAMA ABDELFATTAH,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET
AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01842)

*Erica L. Ross*, appointed by the court, argued the cause as *amicus curiae* for appellant. With her on the briefs were *David W. DeBruin* and *Paul M. Smith*, appointed by the court.

*Osama Abdelfattah*, pro se, filed the briefs on behalf of appellant.

*Alan Burch*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Wyneva Johnson*, Assistant U.S. Attorney, entered an appearance.

Before: BROWN and SRINIVASAN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Osama Abdelfattah filed a complaint identifying twenty-one causes of action against the United States Department of Homeland Security, several of its divisions, unnamed federal officials, and unnamed private individuals. Abdelfattah's claims stem from the Government's collection, maintenance, and use of information about him. The district court granted the federal defendants' motion to dismiss each of Abdelfattah's claims—some for lack of jurisdiction and some for failure to state a claim on which relief may be granted. We affirm the district court's judgment as to all claims except those brought under the Fair Credit Reporting Act.

I

A

When reviewing a motion to dismiss, we "treat the complaint's factual allegations as true" and "must grant [the plaintiff] the benefit of all inferences that can be derived from the facts alleged." *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 677 (D.C. Cir. 2009). The facts set forth below are compiled from the First Amended Complaint, Abdelfattah's Response in Opposition to the Motion to Dismiss or in the Alternative Motion to Amend the Complaint, two affidavits filed by Abdelfattah, and the exhibits attached thereto. We may consider the affidavits and exhibits in this appeal because they were filed by a *pro se* litigant and were intended to clarify the allegations in the complaint. *Id.* (considering

affidavits and exhibits filed by a *pro se* litigant when evaluating a motion to dismiss); *see also Greenhill v. Spellings*, 482 F.3d 569, 572 (D.C. Cir. 2007) (consideration may be given to "supplemental materials filed by a pro se litigant in order to clarify the precise claims being urged"). The district court considered the affidavits and exhibits under similar reasoning, *Abdelfattah v. U.S. Dep't. of Homeland Sec.*, 893 F. Supp. 2d 75, 76 n.2 (D.D.C. 2012), and neither the parties nor Amicus have raised an objection.

Mr. Abdelfattah, a Jordanian national, has lived in the United States since 1996, when he arrived on a student visa to attend the University of Bridgeport. While a student, he lived in a shared apartment with several roommates. For a six-month period in or around 1998, one of his roommates was a man who later became a person of interest in the investigation of the September 11, 2001 terrorist attacks. Abdelfattah did not know this man prior to living with him and has had no further communications with him, although he is aware that the man was arrested for fraud and deported.

Abdelfattah graduated with a master's degree in computer engineering in 1998 and accepted a job with an employer who sponsored his work visa. In December 2001, he submitted an I-485 application to adjust his immigration status to that of a permanent resident. He also submitted an I-765 application for employment authorization, which was approved for a one-year period expiring in January 2003. At some point in 2002, Abdelfattah moved to New Jersey and again filed an I-765 to renew his employment authorization. When this application had not been approved by early 2003, he phoned the United States Department of Homeland Security's ("the Department" or "DHS") Citizenship and

Immigration Services' ("USCIS") Vermont Service Center.[1] Abdelfattah was informed that he was the subject of a "security background check" and that the amount of time needed to process his I-765 application was therefore "unknown." First Amend. Compl. ¶ 123. He visited immigration offices on multiple separate occasions attempting without success to obtain an interim employment authorization document. Each time he experienced a lengthy wait, and once he got into an argument with an immigration officer who threatened to call the police.

In September 2003, after a visit to an immigration office where he was "detained for about 8 hours but let go," *id*. ¶ 129, Abdelfattah obtained an interim employment authorization valid for eight months. In January 2004, Abdelfattah accepted a software engineering job with a company on Long Island, New York. In February 2004, DHS granted a four-month extension on Abdelfattah's employment authorization but did not send him the corresponding card. Abdelfattah's employment authorization was again extended in May 2004, this time for another eight months.

In June 2004, Abdelfattah moved to New York, and DHS approved his I-485 application and instructed him to appear at an immigration office in New York for Green Card processing. On July 2, 2004, Abdelfattah went to the immigration office and provided documentation, including his notice to appear, interim employment authorization document, and passport, to an immigration officer who fingerprinted him and asked him to wait. While waiting with his wife and one-

---

[1] USCIS is a unit of the Department. Abdelfattah has named the Department and several of its divisions as defendants. We refer to the Department and its various divisions collectively and interchangeably as "the Department" or "DHS."

year-old daughter in a room full of people, Abdelfattah was approached by six immigration officers with two dogs. He complied when asked to accompany one of the officers to a separate room where he was searched, his wallet's contents were examined, and he was questioned about his immigration status and employment.

Two Federal Bureau of Investigation ("FBI") agents arrived and questioned Abdelfattah about his former roommate. The agents then asked a series of questions including whether Abdelfattah had weapons training, where he had traveled, if he prayed, whether he gave money to charity, and what he thought about Americans. Finally, the agents inquired about his willingness to work as an FBI informant. He gave the agents the names of and contact information for some of his family and friends. After the interview ended, Abdelfattah proceeded to the Alien Documentation, Identification, and Telecommunications ("ADIT") unit and demanded that an immigration officer stamp his passport.[2] The officer refused, stating his application for permanent resident status had been approved by mistake. The officer returned Abdelfattah's passport, but kept his notice to appear and interim employment authorization document.

In September 2004, DHS visited both Abdelfattah's workplace and his home, inquiring about him at each location. On September 10, 2004, Abdelfattah returned to the New

---

[2] "[A]n ADIT stamp mark is placed in an alien's passport at a port of entry or at an [immigration] . . . district office; . . . this stamp mark serves as temporary proof of lawful permanent residence in the United States" and functions as "authorization for employment, such that a passport with an ADIT stamp mark can be used as identification to obtain a valid Social Security card." *United States v. Polar*, 369 F.3d 1248, 1250 n.1 (11th Cir. 2004).

York immigration office with his counsel to request the ADIT passport stamp. After Abdelfattah waited in the office for six hours, an immigration officer then marked his passport with a stamp valid for 60 days. The officer advised him that the ADIT unit would be investigating the names he had used and his former addresses. In December 2004, an FBI agent contacted Abdelfattah via telephone and threatened him with deportation if he did not agree to work as an FBI informant. In May 2005, Abdelfattah sought another stamp for his passport at the New York immigration office. Officials refused. He filed suit against the federal government in the Eastern District of New York and reached a settlement under the terms of which Abdelfattah agreed to drop the lawsuit in exchange for an ADIT stamp valid for one year. While Abdelfattah did not immediately receive a physical Green Card, he does claim to currently possess one. Decl. of Abdelfattah ¶ 2 (Mar. 18, 2012).

Mr. Abdelfattah submitted a Freedom of Information Act ("FOIA") request for records pertaining to his I-485 application. After filing a FOIA lawsuit in the Eastern District of New York, he received 337 pages of information in March 2005. The FOIA response included a Significant Incident Report outlining the events of July 2, 2004. The report stated Abdelfattah was an "exact match on a terrorism lookout," Mtn. to Amend Compl. Ex. A, and that a TECS record indicated Abdelfattah may be associated with an individual, whose name is redacted, who was arrested in December 2001 for document fraud.

TECS, which is no longer an acronym but once stood for "Treasury Enforcement Communication System," is a federal government database containing "temporary and permanent enforcement, inspection and intelligence records relevant to the anti-terrorism and law enforcement mission of U.S.

Customs and Border Protection and numerous other federal agencies that it supports."[3] *Privacy Act of 1974; U.S. Customs and Border Protection – 011 TECS System of Records Notice*, 73 Fed. Reg. 77,778, 77,779 (Dec. 19, 2008). TECS records are retained for 75 years "from the date of collection of the information or for the life of the law enforcement matter to support that activity and other enforcement activities that may become related." *Id.* at 77,782.

The response to his FOIA request also contained a Memorandum of Investigation dated September 24, 2004 stating Abdelfattah had been referred for investigation based on a possible match in TECS and that he "may be linked to terrorist/National Security activities" according to a record in TECS. Mtn. to Amend Compl. Ex. B. The report concludes that after further investigation, the "trace hit" for Abdelfattah was "negative" and that the "[c]ase is closed for IBIS hit purposes." *Id.* The FOIA response documents included another Memorandum of Investigation discussing DHS's visit to Abdelfattah's place of work and home, several redacted TECS database entries regarding Abdelfattah, a list of Abdelfattah's previous addresses, and a computer screen shot of data entry fields filled with Abdelfattah's driver's license numbers, credit card number, and notation of the type and issuer of the credit card. In September 2007, Abdelfattah wrote to several DHS divisions requesting the TECS records be expunged. He did not receive a response.

Abdelfattah suffers a malady common to exiles—the longing to go home. His sense of being a stranger in a strange land is exacerbated by his belief that he has been subjected to

---

[3] U.S. Customs and Border Protection is a division of the Department.

years of unjustified scrutiny and harassment. Abdelfattah's experiences with DHS have left him depressed. He is reluctant to travel outside the United States, because he fears he will not be permitted to reenter or that he may be tortured or killed by a foreign government. As of March 2012, Abdelfattah had not seen his siblings for ten years. He has expended significant resources on attorney's fees in fifteen lawsuits he has filed against the United States government.

## B

Abdelfattah filed this suit *pro se* on October 11, 2007. His amended complaint identifies twenty-one causes of action. Abdelfattah claims unidentified companies and their employees provided—and DHS received—Abdelfattah's address history, driver's license number, and credit card number in violation of the Privacy Act of 1974, 5 U.S.C. § 552a, the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*., and the Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq.* Abdelfattah further asserts that DHS's creation and maintenance of the TECS records violates the Fifth Amendment to the Constitution. As relief, Abdelfattah seeks monetary awards for the alleged statutory violations, and expungement of the TECS records for the alleged constitutional violations.

In addition to these claims, Abdelfattah raised, and the district court dismissed, Fifth Amendment equal protection claims, along with claims brought under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the Gramm Leach Bliley Act, 15 U.S.C. §§ 6801 *et seq*., and 42 U.S.C. § 1983. However, since neither Abdelfattah nor court-appointed Amicus pursue these claims on appeal, they are forfeited. *See American Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (stating issues not argued in the opening

brief are forfeited on appeal). Abdelfattah also asserted a Fourth Amendment claim, a Due Process reputation-plus claim, and an Administrative Procedure Act, 5 U.S.C. § 706(2)(A), claim below but did not pursue them on appeal, and Amicus's references to these claims constitute "cursory arguments made only in [] footnote[s]" which we need not consider and deem forfeited. *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 539–40 n.3 (D.C. Cir. 1999); *see also CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("A footnote is no place to make a substantive legal argument on appeal; hiding an argument there and then articulating it only in a conclusory fashion results in forfeiture.").

In September 2012, the district court dismissed Abdelfattah's claims. *Abdelfattah*, 893 F. Supp. 2d at 76. The district court first found TECS exempt from any relevant Privacy Act requirements and accordingly dismissed Abdelfattah's Privacy Act claims for lack of jurisdiction. *Id.* at 81. The district court next dismissed the constitutional claims, related to the Department's failure to amend or delete its TECS records, for failure to state a claim upon which relief could be granted. The court explained these claims were "'encompassed within the remedial scheme of the Privacy Act' and so cannot be brought separately when Privacy Act claims are available." *Id.* at 81–82 (quoting *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003)). In the alternative, the district court found Abdelfattah's factual allegations insufficient to state any plausible claim. *Abdelfattah*, 893 F. Supp. 2d at 82. The district court then found Abdelfattah failed to state a Fair Credit Reporting Act claim, because collection of information such as an individual's name, address history, and credit card number is not prohibited by the Act. *Id.* at 82–83. Finally, the court found Abdelfattah failed to plead sufficient factual allegations to state a Right to Financial Privacy Act claim. *Id.* at 83.

This appeal followed. After receiving supplemental briefing, a special panel of this court denied the Appellees' Motion for Summary Affirmance and appointed amicus to represent Abdelfattah. Order, *Abdelfattah v. Dep't of Homeland Security*, No. 12-5322 (D.C. Cir. Feb. 8, 2014). The district court exercised jurisdiction over this case pursuant to 28 U.S.C. § 1331, and we have jurisdiction to review its final order under 28 U.S.C. § 1291.

We review the district court's "dismissal of claims for want of subject matter jurisdiction under Rule 12(b)(1) or for failure to state a claim under Rule 12(b)(6)" *de novo*. *El Paso Natural Gas Co. v. United States*, 750 F.3d 863, 874 (D.C. Cir. 2014) (citing *Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "A document filed *pro se* is to be liberally construed, . . . and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks omitted). Even still, a *pro se* complaint "must plead factual matter that permits the court to infer more than the mere possibility of misconduct." *Jones v. Horne*, 634 F.3d 588, 596 (D.C. Cir. 2011) (internal quotation marks omitted).

## II

Under the Privacy Act, an agency may "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President" and is required to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C. § 552a(e)(1), (2). Under some circumstances, however, an agency may "exempt certain of [its] systems of records from many of the obligations [the Privacy Act] imposes." *Skinner v. U.S. Dep't of Justice*, 584 F.3d 1093, 1096 (D.C. Cir. 2009) (citing 5 U.S.C. § 552a(j)).

Invoking this provision, the Department of Treasury exempted TECS from certain Privacy Act provisions. *See* 31 C.F.R. § 1.36(c)(1)(iv), (2) (exempting TECS from 5 U.S.C. §§ 552a(d)(1)–(4), 552a(e)(1)–(3), (5), 552a(g)). The district court found TECS is exempt "from all of the Privacy Act requirements that Mr. Abdelfattah would enforce in this suit, as well as the jurisdictional provision that would allow him to bring it." *Abdelfattah*, 893 F. Supp. 2d at 81. The district court therefore dismissed the Privacy Act claims against the Department, and Abdelfattah does not challenge this determination on appeal.[4]

---

[4] Abdelfattah also raised Privacy Act claims against unnamed private corporations and DHS officials. The district court properly dismissed these claims *sua sponte*, as the Privacy Act creates a cause of action against only federal government agencies and not private corporations or individual officials. *See Martinez v. Bureau of Prisons*, 444 F.3d 620, 624 (D.C. Cir. 2006) (stating no cause of action against individual employees exists under the Privacy Act);

Abdelfattah does argue—and we agree—the district court erred in holding that constitutional claims related to DHS's collection and maintenance of the TECS records are barred by the Privacy Act. In *Chung*, this court noted the Privacy Act provided a comprehensive remedial scheme—one of the factors the Supreme Court has held militates against a court-erected course of action for money damages—and we therefore declined to recognize a *Bivens* cause of action for the plaintiff's constitutional claims. 333 F.3d at 273. It follows that Abdelfattah cannot pursue a *Bivens* action for DHS's collection and maintenance of his information. Further, to the extent he seeks a *Bivens* remedy from the Department itself, *Bivens* claims are not available against federal agencies. *FDIC v. Meyer*, 510 U.S. 471, 484–85 (1994).

Our precedent does not foreclose, however, the equitable relief of expungement of government records for violations of the Constitution. We have repeatedly recognized a plaintiff may request expungement of agency records for both violations of the Privacy Act and the Constitution. *See Doe v. U.S. Air Force*, 812 F.2d 738, 741 (D.C. Cir. 1987); *Smith v. Nixon*, 807 F.2d 197, 204 (D.C. Cir. 1986); *Hobson v. Wilson*, 737 F.2d 1, 65 (D.C. Cir. 1984) (overruled in part on other grounds by *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)).

---

*Williams v. ALFA Ins. Agency*, 349 F. App'x 375, 376 (11th Cir. 2009) (per curiam) (explaining the Privacy Act does not apply to private corporations). Therefore, it is "patently obvious," Abdelfattah's Privacy Act claims against private corporations and individual officials cannot prevail, and the district court could dismiss them pursuant to Rule 12(b)(6) without notice. *Rollings v. Wackenhut Services, Inc.*, 703 F.3d 122, 127 (D.C. Cir. 2012) (quoting *Baker v. Dir., U.S. Parole Comm'n*, 916 F.2d 725, 727 (D.C. Cir. 1990)).

Such recognition is consistent with our conclusion in *Spagnola v. Mathis*, 859 F.2d 223, 229–230 (D.C. Cir. 1988) (per curiam). There we held the availability of a comprehensive remedial scheme in the Civil Service Reform Act ("CRSA") counseled against extending a *Bivens* cause of action for damages to compensate federal employees and job applicants for constitutional claims. *Id.* at 229. We nevertheless made clear that the CRSA did not preclude judicial review of such constitutional claims altogether. Civil servants and job applicants could still "seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights." *Id.* at 230. Abdelfattah seeks equitable relief for the Department's alleged violations of the Constitution, and Congress's provision of specific Privacy Act remedies does not bar his claims.

## III

### A

Because Abdelfattah's claims "stem[] from [his] difficulty finding work and obtaining Lawful Permanent Resident ['LPR'] status and a Green Card reflecting" that status, the Government makes a tepid argument that his constitutional claims are moot because he is working as a software engineer and has obtained both LPR status and a Green Card. Appellees' Br. at 10 (citing First Amend. Compl. ¶ 39; Decl. of Abdelfattah ¶ 2 (Mar. 18, 2012). Under the mootness doctrine that derives from Article III of the Constitution, federal courts "may only adjudicate actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). Judicial review is precluded where "events have so transpired that [a judicial] decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United*

*States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (internal quotation marks omitted). If Abdelfattah were somehow seeking a declaration of entitlement to LPR status or a physical Green Card, we agree both claims would be moot. However, Abdelfattah requests expungement of the TECS records to remedy DHS's continued maintenance and use of those records. He argues the threat remains that the maintenance and use of the TECS records will lead to future deprivation of his rights. The Government argues Abdelfattah is not entitled to the remedy of expungement and that his allegations of future harm are mere speculation. This is a live controversy, and our decision will affect the respective rights of the parties. *See, e.g., Hedgepath ex rel. Hedgepath v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152–52 (D.C. Cir. 2004) (Fourth and Fifth Amendment claims not mooted by a change in policy where plaintiff sought expungement of arrest record as a remedy); *Doe v. U.S. Air Force*, 812 F.2d 738, 740–41 (D.C. Cir. 1987) (claims not moot where seized documents were returned because an issue remained as to whether expungement of copies retained would be an appropriate remedy should Fourth Amendment violation be found). Abdelfattah's constitutional claims are therefore not moot, and we have jurisdiction to consider whether he has stated a claim or claims upon which relief may be granted.

B

Amicus argues our ruling in *Chastain v. Kelley* recognized a right to expungement or amendment[5] of government records if a plaintiff is "adversely affected" by information contained in them that is "prejudicial without

---

[5] For brevity's sake, we will refer to both expungement and amendment of government records as "expungement."

serving any proper [governmental] purpose."[6] 510 F.2d 1232, 1236 (D.C. Cir. 1975). In *Chastain*, the FBI accused one of its special agents of, *inter alia*, misusing his credentials when, in an attempt to help a female friend, he displayed his badge to and questioned her neighbor about a string of obscene phone calls. *Id.* at 1234. The agent was suspended without pay and notified of his proposed dismissal. *Id.* The agent sued the FBI in federal court seeking restoration to active service, claiming, among other things, he was not afforded due process and the reasons for his suspension and proposed dismissal were "improper or unsubstantiated." *Id.* at 1235–36. While the case was pending, the FBI changed positions, cancelling both the suspension and proposed dismissal. *Id.* at 1235. Accordingly, the Government requested the agent's claims be dismissed as moot. *Id.* The agent, however, moved for an order requiring all records related to the incident to be expunged, which the district court granted after the Government failed to timely oppose the motion. *Id.* In an untimely filing, the Government opposed expunction,

---

[6] The Government argues Abdelfattah waived this argument—raised here by Amicus—by not raising it in the proceedings before the district court. Abdelfattah's *pro se* pleadings must be liberally construed. *Erickson*, 551 U.S. at 94. He did claim below that the TECS records should be expunged, stating the records associate him with terrorism, that he is being adversely affected as a result, and that the Department has no need for maintaining the records. Mtn. to Amend Compl. at 2, 6 (citing *Chastain*, 510 F.2d at 1235). This is sufficient for a *pro se* litigant to preserve the argument that he possesses a legally cognizable right to the expungement of prejudicial records that do not serve a proper governmental purpose. Amicus refined the argument, but "[i]t is precisely because an untrained pro se party may be unable to identify and articulate the potentially meritorious arguments in his case that we sometimes exercise our discretion to appoint amici." *Bowie v. Maddox*, 642 F.3d 1122, 1135 n.6 (D.C. Cir. 2011).

explaining its decision not to terminate the agent did not mean he had been "absolved of any wrongdoing." *Id.* at 1237. To the contrary, the Government maintained the agent had in fact "misuse[d] his credentials and . . . unnecessarily involve[d] the FBI in a matter over which it had no jurisdiction." *Id.* Further, the agent himself did not entirely deny wrongdoing and recognized he was guilty of "questionable judgment." *Id.* at 1238.

After unsuccessfully requesting reconsideration, the Government appealed. We began by noting "federal courts are empowered to order the expungement of Government records where necessary to vindicate rights secured by the Constitution or statute." *Id*. at 1235. This power is an "instance of the general power of the federal courts to fashion appropriate remedies to protect important legal rights." *Id.* While the equitable remedy of expungement is a "versatile tool," it is one that "must be applied with close attention to the peculiar facts of each case." *Id.* at 1236. The district court appeared to have issued the expungement order because the motion was not opposed within the appropriate time period and not because the court found expungement warranted after consideration of the merits. *Id.* at 1238. While the district court's order was understandable due to the Government's failure to make a timely filing, we thought the consequences of the Government's errors should not fall on other FBI agents who could potentially be unfairly passed up for promotions or other job benefits in favor of the accused agent once his records were expunged of all mention of his "serious want of sound judgment . . . in the exercise of his official authority."[7] *Id.*

---

[7] The Government argues the relevant language in *Chastain* is dicta, as the "core holding of *Chastain* was <u>reversal</u> of the district court's order of expungement." Appellee's Br. at 13. To the

Consequently, we vacated the order of expungement and instructed the district court not to reissue it "prior to a hearing on the extent to which the information in the [FBI's] files violates [Chastain's] rights without serving any legitimate needs of the [FBI]." *Id.* at 1237. Assuming the FBI had violated the agent's rights, those rights had largely been vindicated when he was reinstated to active duty. *Id.* at 1238. However, we noted in language that now forms the basis of Amicus's argument, "There may remain a right not to be adversely affected by the information in the future. Such a right may exist if the information (1) is inaccurate, (2) was acquired by fatally flawed procedures, or (3) . . . is prejudicial without serving any proper purpose of the [FBI]." *Id.* at 1236. While we expressed skepticism that any of these conditions existed in the case at hand, we left the determination to be made by the district court after a hearing on the merits. *Id.*

This passage does not recognize a standalone right to expungement of government records that are inaccurate, were acquired by flawed procedures, or are prejudicial and do not serve any proper governmental purpose. We clearly stated in *Chastain* that expungement is a *remedy* that may be available to vindicate statutory or constitutional rights. *See id.* at 1235 (expungement may be ordered "where necessary to vindicate rights secured by the Constitution or by statute"); *id.* (authority to order records expunged is part of courts' power "to fashion appropriate remedies to protect important legal rights"); *id.* at 1236 (describing expungement as an "equitable remedy"). A court does not fashion equitable remedies without first finding a violation of an established legal right

contrary, our "core holding" in *Chastain* was that the order of expungement was *premature*. Our identification of the factors the district court must consider before reissuing the order of expungement was essential to the decision and therefore part of our holding.

has occurred or is imminent. *See, e.g.,* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining a remedy as "[t]he means of enforcing a right or preventing or redressing a wrong"). In *Chastain*, it was not clear the agent's rights had been violated. We therefore ordered the district court to conduct a hearing to determine the extent to which his rights were violated. *Chastain*, 510 F.2d at 1237. We further instructed that even if the agent's rights were violated, the remedy of expungement would only be appropriate if at least one of the enumerated conditions were present. *Id.* at 1236. In other words, if the agent's suspension and proposed termination were illegal, the district court must then separately determine whether he should be protected from any adverse consequences that might arise from the information about the incident remaining in his records. This determination would involve careful weighing of the litigants' respective interests.

Admittedly, our use of the word "right" in describing the conditions under which the remedy of expungement would be appropriate could be a source of confusion. But Amicus's reading requires finding the proverbial elephant in the mouse hole. There is no indication in *Chastain* that we were recognizing a distinct legal right to expungement of government records. None of the substantive analysis prerequisite to recognizing a right enforceable in federal court is present. The source of the right to expungement is not identified, although Amicus focuses on substantive due process. Amicus's Rep. Br. at 7–8 n.7. Nor does the court grapple with separation of powers concerns that would arise from the judiciary assuming authority over routine maintenance of executive branch records. *See Sealed Appellant v. Sealed Appellee*, 130 F.3d 695, 699 (5th Cir. 1997) ("The President, not the district court, runs the executive branch—and it is he who decides how that branch

will function.  There is no specific exception to this general constitutional rule for expungement.").  A court intending to identify a substantive constitutional right to compel expungement of material "not serving any proper purpose" would surely have wrestled with the difficult questions inherent in every word of that phrase.  Finally, the *Chastain* court made no attempt to distinguish conflicting precedent. *See Finley v. Hampton*, 473 F.2d 180, 185 (D.C. Cir. 1972) (holding a federal employee had no legally cognizable right to expungement of "adverse and perhaps untrue" information in his personnel file "in absence of a real threat of injury").

Therefore, reading *Chastain* both for what it says and what it does not say, the case establishes a modest proposition: expungement of government records is an equitable remedy that may be available under certain circumstances to vindicate constitutional and statutory rights. The subsequent treatment of *Chastain*—in cases cited by Amicus—further supports this reading.  Orders of expungement have typically been contemplated for well-defined constitutional claims.  In *Doe v. U.S. Air Force*, we relied on *Chastain* to explain expungement of the copies of records seized from the plaintiff's Air Force barracks may be an "available as a remedy *if* it be determined that the retained copies and information were unconstitutionally obtained." 812 F.2d 738, 740–41 (D.C. Cir. 1987) (emphasis added).  In *Hobson v. Wilson*, we cited *Chastain* when explaining "expungement of records is, in proper circumstances, a proper *remedy* in an action brought directly under the Constitution." 737 F.2d at 65 (emphasis added).  The actions brought directly under the Constitution in that case were claims that federal officials had interfered with the plaintiffs' "exercise of their First Amendment rights."  *Id*. at 13.

As a thorough reading of the opinion and our subsequent case law demonstrate, we did not in *Chastain*—nor do we today—recognize a nebulous *right* to expungement of government records that are inaccurate, were illegally obtained, or are "prejudicial without serving any proper purpose;" instead expungement is a potentially available *remedy* for legally cognizable injuries.[8] Abdelfattah fails to state a claim under Amicus's *Chastain* theory, because identifying a remedy is not stating a claim. *See Sealed Appellant*, 130 F.3d at 700 ("We should not elevate a mere remedy to the status of a right. The fashioning of a remedy should be based on something else. A petitioner cannot come into court to ask for an injunction and have the harm the injunction is based on be the fact that the government officers would not enjoin themselves. Something is missing. That something is injury to a legally protected interest.").

## C

We next consider Abdelfattah's procedural due process claim. "A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections."

---

[8] We note that even if *Chastain* did recognize a distinct right to, or liberty interest in, expungement of prejudicial records that do not serve any proper governmental purpose, Abdelfattah's claims arguably fail. It would be difficult for a court to find the government has no "proper purpose" in retaining information about Abdelfattah's association—albeit attenuated—with his former roommate and DHS's investigation into that association. We can readily perceive that DHS could have a legitimate purpose in retaining information that "connects the dots" in an investigation into a terrorist attack—both to avoid duplicating work in the future and because records of the identities of a suspect's known acquaintances may prove useful.

*Atherton*, 567 F.3d at 689.[9]  While Abdelfattah's First Amended Complaint and Motion to Amend the Complaint repeatedly state his "right to work" and "right to travel" have been stymied, entitlement to relief requires more than putting forth "labels and conclusions." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Abdelfattah must allege sufficient *facts* to state a plausible claim for relief.  *Id.*  We accept, as we must, that the facts he pleaded are true, but we "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

Amicus cites *Greene v. McElroy* for the proposition that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property'" interests protected by the Fifth Amendment. 360 U.S. 474, 492 (1959). *Greene* and its related line of cases recognize a constitutional "right to follow a chosen trade or profession," *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895–96 (1961)).  Thus, when the government formally debars an individual from certain work or implements broadly preclusive criteria that prevent pursuit of a chosen career, there is a cognizable "deprivation of liberty that triggers the procedural guarantees of the Due Process Clause." *Trifax Corp. v. Dist. of Columbia*, 314 F.3d 641, 643–44 (D.C. Cir. 2003).

Abdelfattah has not alleged facts suggesting his liberty or property interest in pursuing his chosen profession has been

---

[9] Abdelfattah, a lawful permanent resident physically present in the United States, is a "person" within the meaning of the Fifth Amendment and is entitled to its protections. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953).

implicated. He is a software engineer and has made no allegations to suggest that any action on the part of DHS has precluded him from working in that field. To the contrary, at the time he filed his First Amended Complaint, he claimed to still be working as a software engineer. First Amend. Compl. ¶ 39. Abdelfattah alleges the government interfered with his right to work by visiting his workplace and speaking with his employer and that he could have lost his job as a result. But even if he had, the loss of "one position in [the] profession" is insufficient to implicate a Fifth Amendment liberty interest in following one's chosen trade or profession. *Kartseva*, 37 F.3d at 1529. Rather an individual must suffer a binding disqualification from work or broad preclusion from his or her chosen field. *Id.* at 1528–29.

Abdelfattah further asserts DHS deprived him of his "right" to travel internationally. The Due Process Clause of the Fifth Amendment protects a liberty interest in international travel. *See, e.g., Califano v. Aznavorian*, 439 U.S. 170, 176 (1978). However, Abdelfattah has not alleged any facts suggesting that his freedom to travel internationally has been infringed or adversely affected. His passport has not been confiscated, and he makes no claim of being denied access—even temporarily—to any means of transportation exiting or entering the United States; nor does he claim to have been subjected to heightened searches or questioning while traveling. He is therefore unlike the plaintiffs in the cases cited by Amicus. *See Shachtman v. Dulles*, 225 F.2d 938 (D.C. Cir. 1955) (Secretary of State denied U.S. citizen's application for a passport); *Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014) (plaintiff told he was on the No Fly List and denied boarding on a flight to United States); *Latif v. Holder*, 969 F. Supp. 2d 1293, 1296 (D. Or. 2013) (plaintiffs "not allowed to board flights to or from the United States or over United States air space"). Instead Abdelfattah alleges he

is concerned that because of the TECS records, if he leaves the United States he will not be permitted to return or that he may be tortured or killed by a foreign government. His fears are largely based on anecdotal evidence of others being subjected to such treatment. First Amend. Compl. ¶¶ 199–204; 205–211. Abdelfattah's allegations are too speculative and intangible to state a claim of deprivation of liberty.

Our discussion thus far has been limited to the liberty interests in work and travel protected under the Fifth Amendment's Due Process Clause. Abdelfattah seems to argue, however, that his status as a LPR creates concomitant rights to proper documentation of that status. To the extent we can understand their arguments, Abdelfattah and Amicus both seem to suggest that these rights form the basis of liberty or property interests protected by due process. If they are making such an argument, we are unable to evaluate it. First, neither Abdelfattah nor Amicus cites the statutes or regulations conferring these rights on LPRs. Next, they failed to put forth any argument or citation to authority supporting the proposition that the statutory or regulatory rights of LPRs create Fifth Amendment liberty or property interests. Further, they did not discuss the parameters of these asserted interests. Therefore, whether Abdelfattah has stated a claim on these grounds is not a question properly before us, and we decline to reach it. *See* FED. R. APP. P. 28(a)(9)(A) (requiring parties to provide "citations to the authorities . . . on which [they] rel[y]" to support their arguments). We do "not consider 'asserted but unanalyzed arguments' because 'appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.'" *Anna Jacques Hosp. v. Sebelius*, 583 F.3d 1, 7 (D.C. Cir. 2009) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)).

24

D

Abdelfattah, with the help of Amicus, argues he has stated claims of violations of his substantive due process rights. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). This is so "whether the fault lies in a denial of fundamental procedural fairness . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). However, the Constitution is not a "font of tort law," and the need to protect the "constitutional proportions of constitutional claims" is particularly acute "in a due process challenge to executive action." *Id.* at 847 n.8. Balancing these principles, the Supreme Court has recognized that some executive actions may be "arbitrary in the constitutional sense." *Id.* at 846. However, only "deprivations of liberty caused by 'the most egregious official conduct,' . . . may violate the Due Process Clause." *Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (plurality opinion) (quoting *Lewis*, 523 U.S. at 846). "Thus, in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8.

Amicus argues Abdelfattah stated a substantive due process claim that DHS deprived him of his liberty interests in working and in travelling internationally in a manner that was "arbitrary, or conscience shocking, in the constitutional sense." *Id.* at 849. But these arguments fail for the same reason as the procedural due process claims discussed above: Abdelfattah has not alleged facts suggesting he has been deprived—arbitrarily or otherwise—of a cognizable liberty or

property interest. *See George Washington Univ. v. Dist. of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003) (stating the "doctrine [of substantive due process] normally imposes only very slight burdens on the government to justify its actions, it imposes none at all in the absence of a liberty or property interest"); *Yates v. Dist. of Columbia*, 324 F.3d 724, 725–26 (D.C. Cir. 2003) (asking first whether plaintiff possessed a property interest before evaluating whether the official conduct he complained of was egregious).

Amicus next argues, alternatively, that *Chastain* creates a cognizable liberty interest in the expungement of prejudicial government records that do not serve a proper purpose. As discussed above, expungement is an equitable remedy that may be warranted to vindicate violations of constitutional or statutory rights. As there is no right to expungement, it follows there is no liberty interest in expungement. *See Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (explaining to constitute a cognizable liberty interest, plaintiff must have a "legitimate claim of entitlement" to the government conduct in question). At its base, Amicus's argument is that Abdelfattah has stated a substantive due process claim simply because he has alleged DHS treated him arbitrarily. However, "[m]erely labeling a governmental action as arbitrary and capricious, in the absence of a deprivation of life, liberty, or property, will not support a substantive due process claim." *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999) (en banc); *see also Nunez v. City of Los Angeles*, 147 F.3d 867, 873–74 (9th Cir. 1998) (explaining "[t]here is no general liberty interest in being free from capricious government action. . . . Otherwise, as then-Judge Stevens explained, 'every time a citizen [i]s affected by government action, he would have a federal right to judicial review.'") (quoting *Jeffries v. Turkey Run Consol. Sch. Dist.*, 492 F.2d 1, 4 n.8 (7th Cir. 1974)); *but see Willowbrook v.*

*Olech*, 528 U.S. 562, 564 (2000) (noting the Court's recognition of "successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment").

Abdelfattah alleges DHS violated his substantive due process rights by detaining him. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing" a claim. *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (internal quotation marks omitted). Abdelfattah's claim of illegal seizure is cognizable under the Fourth Amendment and therefore cannot proceed under the doctrine of substantive due process. *Id.*

He next argues the FBI and DHS's repeated questioning, requests that he become an informant, threats of deportation, delays in processing his applications for immigration benefits, and refusals to provide proper documentation constitute substantive due process violations. He alleges DHS will continue to subject him to similar treatment so long as the TECS records remain. But neither Abdelfattah nor Amicus offers an argument or citation to authority to establish that these alleged acts implicate a liberty interest cognizable under the Due Process Clause. *Cf. Mudric v. Attorney General of United States*, 469 F.3d 94, 99 (3d Cir. 2006) ("No constitutional injury occurred from the INS delays in this case because [the plaintiff] simply had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived, much less a constitutional right to have them doled out as quickly as he desired.");

*Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991) ("Fear or emotional injury which results solely from verbal harassment or idle threats is generally not sufficient to constitute an invasion of an identified liberty interest.") (citations omitted) (abrogated in part on other grounds by *Martinez v. Cui*, 608 F.3d 54, 64–65 (1st Cir. 2010)). We therefore do not evaluate whether he has stated a substantive due process claim based on harassment, threats of deportation, or administrative delays he has been or will be subjected to by DHS. *See* FED. R. APP. P. 28(a)(9)(A), *Anna Jacques Hosp.*, 583 F.3d at 7.

Even if Abdelfattah had alleged a cognizable deprivation of a liberty or property interest, a question would remain: do his pleadings state plausible allegations of conduct that "may fairly be said to shock the contemporary conscience"? *Lewis*, 523 U.S. at 847 n.8; *cf. Vogrin v. Swartswelder*, No. 04-5052, 2004 WL 2905328 (D.C. Cir. Apr. 5, 2004) (per curiam) (finding at the motions to dismiss stage plaintiffs had not stated a claim of "abuse of government power that shocks the conscience"). While the precise threshold for alleging an executive action violates substantive due process rights is "unclear," *Am. Fed'n of Gov't Emps., AFL-CIO, Local 466 v. Nicholson*, 475 F.3d 341, 344 (D.C. Cir. 2007) (stating "a mere violation of law does not give rise to a due process claim"); *see also Lewis*, 523 U.S. at 847 ("While the measure of what is conscience shocking is no calibrated yard stick, it does, as Judge Friendly put it, 'poin[t] the way.'" (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (alteration in original))), the bar is high. Accepting the facts as true, Abdelfattah has gone through an ordeal that surely has been frustrating, distressing, and, at intervals, infuriating, but the exasperation engendered by bureaucratic obduracy is probably not enough. While we need not and do not make that determination here, we remain skeptical.

28

IV

Abdelfattah asserts claims under the Fair Credit Reporting Act and the Right to Financial Privacy Act against the Department, unnamed federal officials, and unnamed corporate defendants. Abdelfattah learned the Department is in possession of his previous addresses and phone numbers, his social security number, his driver's license numbers, and his credit card number when he reviewed information he received in response to a FOIA request. He also alleges this information was obtained without his consent and not pursuant to a court order. Finally, Abdelfattah says that after conducting research he has concluded the "only place" the Department could have obtained this information is his "credit report header info." First Amend. Compl. ¶ 59.

A

The Right to Financial Privacy Act ("RFPA") "bars financial institutions from 'provid[ing] to any Government authority access to . . . the financial records of any customer' without complying with certain procedures." *Stein v. Bank of America Corp.*, 540 F. App'x 10, 10 (D.C. Cir. 2013) (per curiam) (quoting 12 U.S.C. § 3403(a)). These procedures include receiving the customer's authorization to release the record or obtaining a valid subpoena or warrant. 12 U.S.C. § 3402. "Customers aggrieved by the improper disclosure of their records have a private right of action against the governmental authority that *obtained* the records *and* the financial institution that *disclosed* the records." *Tucker v. Waddell*, 83 F.3d 688, 692 (4th Cir. 1996) (citing 12 U.S.C. § 3417(a)). However, "[t]he most salient feature of the Act is the narrow scope of entitlements it creates. Thus it carefully limits the kinds of customers to whom it applies . . . and the types of records they may seek to protect." *SEC v. Jerry T.*

*O'Brien*, 467 U.S. 735, 745 (1984). Under the RFPA, "financial records" are "information known to have been derived from, any record held by a financial institution pertaining to a customer's relationship with the financial institution." 12 U.S.C. § 3401(2). A "customer" is "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution, or for whom a financial institution is acting or has acted as a fiduciary, in relation to an account maintained in the person's name." *Id.* § 3401(5). Finally, a "financial institution" is "any office of a bank, savings bank, card issuer, . . . industrial loan company, trust company, savings association, building and loan, or homestead association (including cooperative banks), credit union, or consumer finance institution." *Id.* § 3401(1).[10]

Abdelfattah has not alleged facts sufficient to show a violation of the RFPA's narrow provisions. He has not identified the source of the alleged disclosure to the government, and he failed to allege that entity is a "financial institution" within the meaning of the Act. He has not alleged he was a "customer" of the offending entity. Finally, he alleged on information and belief that the record that was disclosed was his credit report header. He does not explain how that record pertains to his relationship with the financial institution that made the alleged disclosure or why he believes the credit report header was disclosed by a financial institution as opposed to a credit reporting agency not

---

[10] RFPA contains an exception allowing access to financial records to a "Government authority authorized to conduct investigations of, or intelligence or counterintelligence analyses related to, international terrorism for the purpose of conducting such investigations or analyses." 12 U.S.C. § 3414(a)(1)(c). The Government expressly waived reliance on this provision at oral argument. Oral Arg. Tr. at 40:2–10.

regulated by the RFPA. Even liberally construing Abdelfattah's *pro se* complaint, he has not "plead[ed] factual matter that permits [us] to infer more than the mere possibility of misconduct." *Jones v. Horne*, 634 F.3d 588, 596 (D.C. Cir. 2011) (internal quotation marks omitted).

B

"Congress enacted the [Fair Credit Reporting Act ("FCRA")] in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007). FCRA regulates the dissemination and use of "consumer reports." To qualify as a consumer report under FCRA, information must satisfy two elements. First, it must be a "written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a(d)(1). Second, the information must be "used or expected to be used or collected in whole or in part for" one of several purposes identified in the Act. *Id.* The Act prohibits consumer reporting agencies from "furnish[ing] a consumer report" except under specified conditions, and it forbids any person from "us[ing] or obtaining" a consumer report unless it is obtained for certain permissible purposes identified in the statute. *Id.* § 1681b(a), (f). The Act's definition of "person" includes any "government or governmental subdivision or agency." *Id.* § 1681a(b). Under FCRA, a governmental agency may obtain basic identifying information about a consumer from a credit reporting agency. *Id.* § 1681f. This identifying information is limited to the consumer's name, address, former address, places of employment, or former places of employment. *Id.* If a governmental agency desires more detailed information, it

must generally seek a court order or subpoena. *Id.* § 1681b(a)(1). [11] FCRA provides a private cause of action against "[a]ny person" who willfully or negligently fails to comply with its requirements. *Id.* §§ 1681n; 1681*o*. The Government argues, and the district court found, that the information Abdelfattah alleges was illegally furnished to the Department does not constitute a "consumer report" within the meaning of the Act because it does not bear on Abdelfattah's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a(d)(1). The district court therefore dismissed the claims. *Abdelfattah*, 893 F. Supp. 2d at 82–83. Amicus contests this holding only in regards to Abdelfattah's credit card number. Amicus first argues credit card numbers are subject to FCRA's requirements because section 1681c(g) requires the truncation of credit card numbers contained in receipts. This provision is irrelevant, however, as Abdelfattah has made no allegation that the document containing his credit card number is a receipt for a business transaction or that it was "provided . . . at the point of the sale or transaction." 15 U.S.C. § 1681a(d)(1).

---

[11] FCRA contains an exception under which a consumer reporting agency "shall furnish a consumer report of a consumer and all other information in a consumer's file to a government agency authorized to conduct investigations of, or intelligence or counterintelligence activities or analysis related to, international terrorism when presented with a written certification by such government agency that such information is necessary for the agency's conduct or such investigation, activity or analysis." 15 U.S.C. § 1681v. This provision became effective March 9, 2006. The Government expressly waived reliance on this counterterrorism exception to FCRA at oral argument. Oral Arg. Tr. at 40:2–10.

Amicus next argues a credit card number is a "consumer report." The Government responds that the definition of "consumer report" cannot be read so broadly as to include the mere fact that an individual possesses a credit card. This case does not call for us to address whether information merely confirming the existence of a credit card bears on one of the seven enumerated factors because Abdelfattah alleged DHS is in possession of his full and specific credit card number, along with information regarding the type and issuer of the card. That Abdelfattah possesses a major credit card of a specific type and number bears on his mode of living. *Cf. Trans Union Corp. v. FTC*, 81 F.3d 228, 231 (D.C. Cir. 1996) (finding the fact that individuals established two tradelines bore "at least on [their] mode of living"). We therefore reverse the district court's ruling that the FCRA claims failed on the first prong of the definition of "consumer report" and remand for further proceedings.

V

The judgment of the district court should be affirmed as to all aspects except the dismissal of the FCRA claims.

*So ordered.*