# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 14, 2016        Decided June 3, 2016

No. 15-7062

RONALD EUGENE DUBERRY, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01258)

*Aaron Marr Page* argued the cause for appellants. With him on the briefs was *F. Peter Silva*.

*Mary L. Wilson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: HENDERSON, ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

ROGERS, *Circuit Judge*: Four retired D.C. correctional officers appeal the dismissal, for failure to state a claim, of their Section 1983 complaint alleging that the District of Columbia deprived them of their federal right under the Law Enforcement Officers Safety Act ("the LEOSA"), 18 U.S.C. § 926C, to carry a concealed weapon. The LEOSA creates that right, notwithstanding contrary state or local law, for active and retired "qualified law enforcement officer[s]" who meet certain requirements. Those requirements include that the officer received firearms training within the twelve months prior to carrying a concealed weapon and, prior to retirement, had the power to make arrests. Appellants allege that they meet the statutory requirements but have been unable to obtain firearms training because the District of Columbia has refused to certify that, as correctional officers, they had a statutory power of arrest. Upon *de novo* review, we hold that the complaint states a claim under 42 U.S.C. § 1983, and we reverse and remand the case for further proceedings.

**I.**

The Law Enforcement Officers Safety Act establishes the right of "qualified law enforcement officers," both active and retired, to carry a concealed weapon in the United States upon meeting certain conditions. Pub. L. 108-277, 118 Stat. 865 (codified as amended at 18 U.S.C. §§ 926B, 926C). The Act provides, as relevant here:

> *Notwithstanding any other provision of the law of any State or any political subdivision thereof*, an individual who is [1] a qualified retired law enforcement officer and who is [2] carrying the identification required by subsection (d) may carry a concealed firearm that has

been shipped or transported in interstate or foreign commerce, subject to subsection (b).

*Id.* § 926C(a) (emphasis added). A "qualified retired law enforcement officer" is defined as an individual who separated from service in good standing after at least ten years with a public agency as a law enforcement officer and "*before* such separation, was authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law, and had statutory powers of arrest or apprehension." *Id.* § 926C(c)(1)–(3) (emphasis added). The required identification under subsection (d) consists of (1) a photographic identification showing the officer is a former law enforcement officer and (2) a certification from the officer's state of residence (or a state-certified firearms instructor) indicating that the officer has met the firearms standards for active duty officers.[1] Subsection (b)

---

[1] Subsection (d) provides: "The identification required by this subsection is —

> (1) a photographic identification issued by the agency from which the individual separated from service as a law enforcement officer that identifies the person as having been employed as a police officer or law enforcement officer and indicates that the individual has, not less recently than one year before the date the individual is carrying the concealed firearm, been tested or otherwise found by the agency to meet the active duty standards for qualification in firearms training as established by the agency to carry a firearm of the same type as the concealed firearm; or

> (2)(A) a photographic identification issued by the agency from which the individual separated from service as a law enforcement officer that identifies the person as having been employed as a police officer or law enforcement officer; and

excepts private or state or local government property.[2]

---

> (B) a certification issued by the State in which the individual resides or by a certified firearms instructor that is qualified to conduct a firearms qualification test for active duty officers within that State that indicates that the individual has, not less than 1 year before the date the individual is carrying the concealed firearm, been tested or otherwise found by the State or a certified firearms instructor that is qualified to conduct a firearms qualification test for active duty officers within that State to have met —
>
>> (I) the active duty standards for qualification in firearms training, as established by the State, to carry a firearm of the same type as the concealed firearm; or
>>
>> (II) if the State has not established such standards, standards set by any law enforcement agency within that State to carry a firearm of the same type as the concealed firearm.

18 U.S.C. § 926C(d). For purposes of Chapter 44 of Title 18, a "state" is defined to include the District of Columbia. *Id*. § 921(a)(2).

[2] Subsection (b) provides:

> This section shall not be construed to supersede or limit the laws of any State that –
>> (1) permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or
>> (2) prohibit or restrict the possession of firearms on any State or local government property, installation, building, base, or a park.

18 U.S.C. § 926C(b).

According to the amended complaint, appellants are retired former correctional officers of the D.C. Department of Corrections who reside either in the District of Columbia or Maryland, and frequently travel across state borders. Because they have, since their retirement, "frequently encountered former inmates in public" and "[i]n several of these encounters, the former inmates would recognize [appellants] as . . . former correctional officer[s] and sometimes make threats, and/or threatening gestures" toward them, Am. Compl. ¶ 33, they each want to carry a concealed weapon as authorized by the LEOSA. Further, appellants allege that under the LEOSA they are qualified retired law enforcement officials to the extent that each retired in good standing after working for at least ten years for the D.C. Department of Corrections. Am. Compl. ¶¶ 21–23. As correctional officers, each was trained and authorized to carry firearms. *Id.* ¶ 27. Additionally, each appellant has a photo identification card issued by the D.C. Department of Corrections stating that he is a retired employee of the D.C. Department of Corrections where he had the authority to arrest and apprehend, and to act in a law enforcement capacity. *Id.* ¶¶ 56, 61, 66, 71, 76. Indeed, appellant Ronald E. DuBerry was issued a photo identification card by the D.C. Department of Corrections stating that he is a law enforcement officer with authority to make arrests and carry a concealed weapon under D.C. Code § 22-3205 (now D.C. Code § 24-405).[3] *Id.* ¶ 61.

---

[3] D.C. Code § 24-405, Arrest for violation of parole, provides:

If [the U.S. Parole Commission], or any member thereof, shall have reliable information that a prisoner has violated his parole, said [Commission], or any member thereof, at any time within the term or terms of the prisoner's sentence, may issue a warrant to any officer hereinafter authorized to execute the same for the retaking of such prisoner. Any officer of the District of Columbia penal institutions, any officer or designated civilian

What appellants lack is the firearms certification required by subsection (d)(2)(B), *see supra* note 1. To obtain that certification, the District of Columbia and Prince George's County, Maryland, where appellants reside, require a formal Certification of Prior Law Enforcement Employment by an officer's former employer before the officer may receive qualified firearms training from a certified instructor. Am. Compl. ¶ 47c–d. When appellants attempted to obtain this certification of historical facts from the D.C. Department of Corrections their requests were denied on the ground that "[c]orrectional officers do not meet the full criteria and definition required by 'LEOSA'" because D.C. law gave correctional officers neither law enforcement status nor "arrest authority." *Id*. ¶¶ 51, 55.

Appellants filed suit for declaratory and injunctive relief under 42 U.S.C. § 1983, alleging that "[b]y denying certification as retired law enforcement officers" the District of Columbia "deprived [them] of their right to carry concealed firearms under

---

employee of the Metropolitan Police Department of the District of Columbia, or any federal officer authorized to serve criminal process within the United States to whom such warrant shall be delivered is authorized and required to execute such warrant by taking such prisoner and returning or removing him to the penal institution of the District of Columbia from which he was paroled or to such penal or correctional institution as may be designated by the Attorney General of the United States.

The statute refers to the D.C. Board of Parole. Its duties were transferred to the U.S. Parole Commission in 1997 by the National Capital Revitalization and Self-Government Improvement Act, Pub. L. No. 105-33 § 11231(a)–(c), 111 Stat. 712, 745 (1997), *codified at* D.C. Code § 24-131 (2001). *See Bailey v. Fulwood*, 793 F.3d 127, 130 (D.C. Cir. 2015).

LEOSA." *Id*. ¶ 84. The district court dismissed their amended complaint for failure to state a claim on the ground that the "LEOSA does not unambiguously create the individual right that Plaintiffs seek to enforce." *DuBerry v. District of Columbia*, 106 F. Supp. 3d 245, 261 (D.D.C. 2015); FED. R. CIV. P. 12(b)(6). It concluded that even if the D.C. Department of Corrections had violated the law by misclassifying appellants, appellants had no claim under Section 1983 because any LEOSA right did not "attach" until appellants obtained the firearms certification, and alternatively, that the LEOSA did not create a procedural right to have the Department correctly apply the LEOSA definition in processing appellants' prior employment certification form. *Id*. at 261, 269.

The retired correctional officers appeal. Our review of the Rule 12(b)(6) dismissal of their amended complaint is *de novo*, *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009), addressing legal conclusions *de novo* while treating well-pleaded factual allegations in their complaint as true and according appellants the benefit of reasonable inferences, *Doe v. Rumsfeld*, 683 F.3d 390, 391 (D.C. Cir. 2012).

**II.**

Appellants contend that, contrary to the district court's interpretation, the identification requirement under subsection (a) does not define the category of individual entitled to the LEOSA right to carry, but is simply a prerequisite to the exercise of an existing right under the LEOSA. Their claim is that they, as otherwise qualified law enforcement officers, have been deprived of that right as a result of the District of Columbia's unlawful action preventing them from access to required firearms training certificates. They also contend that the district court misconstrued their amended complaint as seeking to vindicate a "procedural right to be classified

correctly" rather than the asserted right to carry concealed firearms under the LEOSA.

Section 1983 provides a remedy for the deprivation of federal constitutional and statutory rights by any person under color of state law.[4] *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980). Its plain text makes clear its remedies encompass violations of federal statutes. The deprivations for which it provides a remedy, however, are only those of "'rights, privileges, or immunities secured by the Constitution and laws' of the United States, . . . not the broader or vaguer 'benefits' or 'interests,'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (quoting 42 U.S.C. § 1983)). Thus, to state a claim, a plaintiff must assert the violation of a federal right. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989).

---

[4] Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

To determine whether appellants had alleged the deprivation of a federal right, the district court looked to *Blessing v. Freestone*, 520 U.S. 329 (1997): A statute creates a right enforceable under Section 1983 if (1) "Congress . . . intended that the provision in question benefit the plaintiff," (2) "the plaintiff . . . demonstrate[s] that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence," and (3) "the statute . . . unambiguously impose[s] a binding obligation on the States" using "mandatory, rather than precatory, terms." *Id*. at 340–41. The district court ruled appellants' claim failed at the first step because they failed to satisfy the identification requirement of subsection (a) in the absence of the firearms qualification certification under subsection (d)(2)(B), and thus any right under the LEOSA had not "attached" and could not be asserted by them. *DuBerry*, 106 F. Supp. 3d at 268–69.

If, as the district court ruled, the LEOSA right that Congress intended to establish does not attach until appellants have in fact obtained the firearms certification, then their access to that right could hinge on the District of Columbia's (or a state's) determination of whether, in its view, a retired law enforcement officer had the power of arrest or otherwise met the LEOSA's requirements. On the other hand, if as appellants contend, Congress created an individual right of which appellants have been deprived due to the District of Columbia's unlawful interference with their ability to obtain the required certification, then they have stated a claim and we must remand the case to the district court for further proceedings.

**A.**

The determination whether appellants have alleged a right remediable under Section 1983 presents the threshold question of what right Congress created in the LEOSA. The district court interpreted the right appellants seek to vindicate as a right to

receive the employment certification from the D.C. Department of Corrections. *See DuBerry*, 106 F. Supp. 3d at 265. In their amended complaint, however, and as explained in their appellate brief, appellants claim that the LEOSA grants them, as qualified retired correctional officers, the right to carry concealed firearms, including the right to carry them across state lines. Am. Compl. ¶ 81; Appellants' Br. 22. Further, they claim that federal right is due protection under Section 1983, Am. Compl. ¶ 82, and that the LEOSA does not foreclose a remedy under Section 1983, *id*. ¶ 83.

We begin with the text of the LEOSA, *see Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252–53 (2004), and conclude that it favors appellants' view of the LEOSA right. Congress used categorical language in the "notwithstanding" clause of subsection (a), to preempt state and local law to grant qualified law enforcement officers the right to carry a concealed weapon. As applied to the three-factor *Blessing* test, the text of the LEOSA creates the type of right remediable under Section 1983.

First, the text supports appellants' claim that Congress intended the LEOSA to benefit individuals like them directly. *Golden State*, 493 U.S. at 106; *Blessing*, 520 U.S. at 340. The plain text of the LEOSA grants retired law enforcement officers a right to carry a concealed firearm "[n]otwithstanding any other provision of the law of any State or any political subdivision thereof." The LEOSA right is not limited to former police officers, but includes, among others, correctional officers and parole authorities who "engage[d] in . . . the incarceration of any person for[ ] any violation of law." 18 U.S.C. § 926C(c)(2). At the time the LEOSA was passed, at least 17 states and the District of Columbia had laws prohibiting the carrying of concealed firearms. *See* Report of the House Committee on the Judiciary, regarding H.R. 218, H.R. Rep. 108-560, at 22 (2004),

*reprinted in* 2004 U.S.C.C.A.N. 805; *see, e.g.*, D.C. Code § 22-3204 (1994). The LEOSA preempted these statutes with respect to active duty and retired "qualified law enforcement officers."

The District of Columbia questions whether appellants are entitled to claim any right under the LEOSA because as correctional officers they were not "trained to determine whether probable cause exists to make a warrantless arrest for any crime in the community," and therefore lack the requisite statutory power of arrest. Appellee's Br. 12, 25. To the extent the existence and nature of appellants' former statutory power of arrest present a factual question, the court must, on a motion to dismiss pursuant to Rule 12(b)(6), accept the allegations of the amended complaint as true. *See Atherton*, 567 F.3d at 681. Appellants allege not only that they are qualified officers but that the District of Columbia has provided them with identification cards stating that they had a power of arrest when they were D.C. correctional officers. Am. Compl. ¶¶ 21–29, 56. To the extent these allegations present a legal question, it is not obvious that the District of Columbia's interpretation of the LEOSA "powers of arrest" is correct. In the LEOSA, Congress defined "qualified law enforcement officers" broadly, to include individuals who engage in or supervise incarceration. Given the breadth of Congress's definition, the reference to "statutory powers of arrest" necessarily means some statutory power of arrest such as a power to arrest parole violators, and not, as the District of Columbia suggests, only the police power to arrest upon probable cause, *see* Appellee's Br. 25. Further, contrary to the District of Columbia's suggestion at oral argument, the LEOSA does not require that, prior to retiring, a law enforcement officer's job required carrying a firearm in order to be a "qualified retired law enforcement officer[]."

Second, the LEOSA right to carry is not the type of "vague and amorphous" right that is "beyond the competence of the

12

judiciary to enforce." *Golden State*, 493 U.S. at 106 (quoting *Wright v. Roanoke Redevelop. & Housing Auth.*, 479 U.S. 418, 431–32 (1987)). The LEOSA sets specific requirements for "qualified law enforcement officers" in historical and objective terms. The definition of such an officer is based on the service requirements of the officer's former law enforcement agency and the circumstances at the time of the officer's retirement. Had the officer been a law enforcement officer for at least ten years? Had the officer retired in good standing? Had the officer had a statutory power of arrest prior to retirement? The answers to these questions are to be found in the officer's personnel records and the statutes in effect before the officer retired. Similarly, the requirement for annual firearms training is defined as the standards for active duty officers and can be met through either the former employing agency or the officer's state of residence or a firearms trainer certified by that state. The LEOSA, then, falls on the side of statutes that are not so vague as to be judicially unenforceable, even where the states may retain some compliance discretion. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 519–20 (1990).

Third, the LEOSA imposes a mandatory duty on the states to recognize the right it establishes. It is more than a mere "'congressional preference' for a certain kind of conduct" but rather "provides a substantive right." *Id*. at 509–10. This is evident from the categorical preemption of state and local law standing in the way of the LEOSA right to carry, *see* 18 U.S.C. § 927, and the nature of the ministerial inquiries into the historical facts in the officer's employment records and statutory powers of arrest, and into the objective firearms standard for active duty officers. The ordinary meaning of the words used by Congress does not afford discretion to the District of Columbia (or a state) to redefine either who are "qualified law enforcement officers" or who is eligible for the LEOSA right. Its plain text, then, confers upon a specific group

of individuals a concrete right the deprivation of which is presumptively remediable under Section 1983. *See Golden State*, 493 U.S. at 107. Although a state may retain some discretion, for example to the extent it concludes that a retired law enforcement officer seeking to exercise a LEOSA concealed-carry right is currently either not physically or mentally capable of being in responsible possession of a firearm, *see* 18 U.S.C. § 926C(c)(5), the District of Columbia makes no such claim as to any of the appellants and consequently the issue of any discretion it may retain is not before this court.

The conclusion that the LEOSA creates an individual right to carry finds additional support in Congress's purpose and the context of its enactment of the LEOSA. *See Engine Mfrs.*, 541 U.S. at 252; *District of Columbia v. Dep't of Labor*, No. 14-5132, slip op. at 13 (D.C. Cir. Apr. 5, 2016). The legislative history demonstrates that Congress's purpose was to afford certain retired law enforcement officers, in view of the nature of their past law enforcement responsibilities, the present means of self-protection and protection for the officer's family and, as an added benefit, to provide additional safety for the communities where the officers live and visit. *See* 150 Cong. Rec. S7301–02 (daily ed. June 23, 2004) (statement of Sen. Leahy); 150 Cong. Rec. H4812–13 (daily ed. June 23, 2004) (statement of Rep. Coble); *see also* Report of the Senate Judiciary Committee, regarding S. 253, S. Rep. No. 108-29, at 4 (2003); H.R. Rep. No. 108-560, at 4; 150 Cong. Rec. E1231 (extension of remarks, June 24, 2004) (statement of Rep. Cunningham). When the LEOSA is viewed in context, it is not insignificant that Congress enacted the LEOSA despite strong dissenting views. *See* 150 Cong. Rec. H4813 (daily ed. June 23, 2004) (statement of Rep. Scott); 150 Cong. Rec. S1624–25 (daily ed. Feb. 26, 2004) (statement of Sen. Dodd). Dissenting statements filed with the Senate and House Judiciary Committees raised

objections to the concealed-carry legislation based on the demand of federalism and the states' traditional police powers, as well as practical concerns about the potential disruption of the efforts by state and local law enforcement to control firearms within their jurisdictions. *See* S. Rep. No. 108-29, at 12–13 (dissenting statement of Sen. Kennedy); H.R. Rep. No. 108-560, at 22–23, 79 (dissenting statement of Rep. Sensenbrenner & Rep. Flake). The practical concerns extended to the broad definition of a qualified retired law enforcement officer to include individuals whose jobs did not require them to carry a firearm and who therefore had not been trained by their employer in the use of a firearm. S. Rep. No. 108-29, at 16; H.R. Rep. No. 108-560, at 70. In the Committees, the response to these objections was expressed in the longstanding support for concealed carry legislation by the Fraternal Order of Police ("FOP") and the Law Enforcement Alliance of America, *see* H.R. Rep. 108-560, at 4, pointing to the needs of officers to defend themselves and to protect their families with the resultant benefit to their communities of additional law enforcement officers. *See Law Enforcement Officers Safety Act: Hearing before Committee on House Judiciary, Subcommittee on Crime, Terrorism, and Homeland Security*, 108th Cong., 2d Sess. (2004) (statement of Chuck Canterbury, FOP National President). The practical objections were addressed by requiring annual firearms training to ensure that all retired officers eligible to carry concealed weapons received the same firearms training as active duty officers. *See, e.g.*, H.R. Rep. 108-560, at 11, 59–60.

Taken together, the LEOSA's plain text, purpose, and context show that Congress intended to create a concrete, individual right to benefit individuals like appellants and that is within "the competence of the judiciary to enforce." *Golden State*, 493 U.S. at 106 (quoting *Wright*, 479 U.S. at 431–32). To the extent the district court ruled appellants were not those

Congress intended the LEOSA to benefit under an attachment theory — where they lack the right until they obtain the subsection (d)(2)(B) firearms certification, *see DuBerry*, 106 F. Supp. 3d at 266–67 — there is no textual indication that Congress contemplated the concealed-carry right to be other than as defined in the straightforward text. Nor is any legislative history cited to the court to that effect. In enacting the requirements for "qualified law enforcement officers" to claim this right, Congress gave every signal that it contemplated no state reevaluation or redefinition of federal requirements. Consequently, the firearms certification requirement does not define the right itself but is rather a precondition to the exercise of that right. Understood as an individual right defined by federal law, the LEOSA concealed-carry right that appellants allege Congress intended for them to have is remediable under Section 1983. Their further allegation that they have been deprived of their ability to obtain and exercise that right because of the District of Columbia's unlawful action is sufficient to state a claim. As the district court observed, "there might be some cases in which a failure to classify an individual as a 'law enforcement officer' denies that individual his right to carry a concealed firearm, which right he attained by satisfying the requirements of subsection (a)." *DuBerry*, 106 F. Supp. 3d at 268. Appellants claim this is such a case, and we hold appellants have sufficiently alleged that the federal right they seek to enjoy has been unlawfully deprived by the District of Columbia to be remediable under Section 1983.

The decisions of our sister circuits on which the district court relied were not interpreting the LEOSA, and are distinguishable. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Port Auth. of N.Y. & N.J.*, 730 F.3d 252 (3d Cir. 2013); *Torraco*

*v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129 (2d Cir. 2010).[5]  In *Torraco*, 615 F.3d at 137, the Second Circuit held that the right conferred was too "vague and amorphous" for enforcement under Section 1983 in view of the difficulty facing a state officer who stopped someone transporting a weapon of knowing the gun laws of both the origin and destination jurisdictions. Under the LEOSA, the officer is required to carry identification indicating the statutory requirements, thereby resolving officer uncertainty.  *Association of New Jersey Rifle and Pistol Clubs*, 730 F.3d at 257, turned on a limitation of the right to carry a weapon interstate to use of a "transporting vehicle," which was held not to include transport by plane, and so plaintiffs were not intended beneficiaries.  Appellants face no comparable obstacle under the LEOSA.

Similarly, the cases relied upon by the District of Columbia are unpersuasive support for the dismissal of appellants' amended complaint.  In *Ramirez v. Port Authority of New York & New Jersey*, 15-cv-3225, 2015 WL 9463185 (S.D.N.Y. Dec. 28, 2015), the district court ruled that the LEOSA created only a defense to civil and criminal liability, but nothing indicates Congress intended to place "qualified law enforcement officers"

---

[5]  Section 926A, at issue in *New Jersey Rifle and Pistol Clubs* and in *Torraco*, authorizes, in pertinent part:

> any person who is not otherwise prohibited by this chapter . . . to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm *if*, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle.

18 U.S.C. § 926A (emphasis added).

at such risks before the concealed-carry right could be exercised, much less that Congress intended to foreclose a Section 1983 remedy. The other district court opinions on the LEOSA cited by the District of Columbia did not address Section 1983, but rather found alternative grounds for denying the claims. *See, e.g.*, *Friedman v. Las Vegas Metro. Police*, No. 2:14-cv-0821, 2014 WL 5472604 (D. Nev. Oct. 24, 2014); *Johnson v. N.Y. State Dep't of Corr. Servs.*, 709 F. Supp. 2d 178 (N.D.N.Y. 2010); *Moore v. Trent*, No. 09 C 1712, 2010 WL 5232727 (N.D. Ill. Dec. 16, 2010). We have no occasion to address such alternative grounds here.

Our dissenting colleague's view that the district court lacked subject matter jurisdiction misapplies *Shoshone Mining Co. v. Rutter*, 177 U.S. 505 (1900). According to the amended complaint, the District of Columbia acknowledged in official Departmental identification cards that appellants, while they were working as D.C. correctional officers, had a power of arrest. *See* Am. Compl. ¶¶ 61, 66, 71, 76. Only when appellants, as retirees, sought to exercise their concealed-carry right under the LEOSA did the District of Columbia change its position. Then, as now, it asserted that appellants lack the power of arrest that Congress intended. It offers no support for this conclusion in the statutory text of the LEOSA or even in the legislative history. Congress defined who is a qualified law enforcement officer to apply not only to police officers but to employees in related law enforcement areas who had a power of arrest. As Congress deemed the federal right to be of preeminent importance, notwithstanding state laws prohibiting the concealed carry of firearms, it left no discretion for a state to revise the historical record of an individual qualified law enforcement officer. Thus, there is no question of rights under D.C. law at issue here, and the Supreme Court's focus in *Shoshone* on "local customs" and limiting state laws where possession of mining rights was at issue, 177 U.S. at 508, is

18

inapposite. Federal law governs appellants' contention that the District of Columbia has unlawfully interfered with a federal right bestowed on them by Congress.

**B.**

Finally, "even when the plaintiff has asserted a federal right, the defendant may show that Congress 'specifically foreclosed a remedy under § 1983.'" *Golden State*, 493 U.S. at 106 (quoting *Smith v. Robinson*, 468 U.S. 992, 1005 n.9 (1984)). The burden to show congressional intent to foreclose a Section 1983 remedy is on the defendant, and courts "do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Wright*, 479 U.S. at 423–24. The District of Columbia has made no such showing. Appellants' amended complaint does not arise under the Spending Clause where the Supreme Court has embraced a narrow interpretation of private damages actions, absent clear contrary congressional intent, because "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Gonzaga University*, 536 U.S. at 280 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)). Nor does anything in the LEOSA itself or its legislative history indicate that exclusive enforcement lies elsewhere or that private enforcement is foreclosed. *See Wright*, 479 U.S. at 425.

Nor has the District of Columbia otherwise rebutted appellants' presumed right to relief under Section 1983. Its reliance on the anti-commandeering doctrine, *see Printz v. United States*, 521 U.S. 898, 925–26 (1997), appears to be misplaced; at least it cites no authority that the doctrine is applicable to it. *See* U.S. Con. Art. I, sec. 8, cl. 17; *Palmore v. United States*, 411 U.S. 389 (1973). Neither the State of

Maryland nor Prince George's County are parties in this case. In any event, there is no occasion to consider whether the doctrine is implicated were the LEOSA interpreted as requiring states to conduct the firearm certification training or to issue the photographic identification in subsection (d)(1) & (2)(A). According to the amended complaint, the District of Columbia and Prince George's County, Maryland voluntarily provide the necessary training and voluntarily established a procedure to obtain needed historical information about appellants. Am. Compl. ¶ 47c–d; *cf. Lomont v. O'Neill*, 285 F.3d 9, 14 (D.C. Cir. 2002). Moreover, any such reservoir of power would not vest the District of Columbia with authority to revise the statutory definition of "qualified retired law enforcement officers" in a manner to deprive appellants of the right to which they are entitled. In preempting state and local law that would interfere with its purpose and intent, 18 U.S.C. § 927; *see Arizona v. United States*, 132 S. Ct. 2492 (2012), Congress set the requirements for LEOSA officers in terms of historical facts about the officer's service and powers of arrest. Appellants allege that the District of Columbia's actions resulting from its erroneous interpretation of how the LEOSA applies to these facts have deprived them of their federally established concealed-carry right.

Accordingly, because appellants' amended complaint states a claim under Section 1983, we reverse the dismissal of their amended complaint and remand the case to the district court for further proceedings.

KAREN LeCraft HENDERSON, *Circuit Judge*, dissenting: My colleagues conclude that the plaintiffs have alleged a cause of action under 42 U.S.C. § 1983. Ordinarily the existence *vel non* of a federal cause of action determines a federal court's subject-matter jurisdiction. *See Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 8 (1983). But this rule knows one "rare exception," *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 748 n.8 (2012), and I believe this case falls within it. In my view the district court was without subject-matter jurisdiction and I would therefore affirm its dismissal order on that ground.

The district court held that it had subject-matter jurisdiction under 28 U.S.C. § 1331 which provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States". *Duberry v. Dist. of Columbia*, 106 F. Supp. 3d 245, 260 & n.14 (D.D.C. 2015). The plaintiffs do not assert an alternative basis for its jurisdiction so I do not consider others. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("burden of establishing [subject-matter jurisdiction] rests upon the party asserting jurisdiction"). The District of Columbia (District) likewise does not challenge the district court's jurisdictional holding but we have a *sua sponte* duty to verify jurisdiction. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006).

Section 1331 is known as the "general federal-question jurisdiction" statute. *Mims*, 132 S. Ct. at 747. "Although the language of § 1331 parallels that of the 'arising under' clause of Article III" of the Constitution, it is well established that "Article III 'arising under' jurisdiction is broader than federal question jurisdiction under § 1331." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 494–95 (1983); *see also Franchise Tax Bd.*, 463 U.S. at 8 n.8. In other words, section 1331 bestows jurisdiction on a smaller class of cases than does the Constitution. Reducing to a formula what claims are

(and what claims are not) provided for is something of a puzzle. "The most familiar" construction of section 1331's "arising under" language is that "[a] suit arises under the law that *creates* the cause of action." *Franchise Tax Bd.*, 463 U.S. at 8–9 (emphasis added) (quoting *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916)). This rule, also known as "Justice Holmes' test" in recognition of the *American Well Works* author, states that where "federal law creates the cause of action," section 1331 provides federal question jurisdiction. *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808, 809 n.5 (1986).

Although the Justice Holmes' test resolves jurisdiction under section 1331 in "the vast majority of cases," *id.* at 808, it does not answer the issue completely. For instance, a claim "may arise under federal law 'where the vindication of a right under *state law* necessarily turn[s] on some construction of federal law.' " *Id.* at 808 (emphasis added) (quoting *Franchise Tax Bd.*, 463 U.S. at 9).[1] Thus, absence of a

---

[1] In the case that established this exception, the plaintiff shareholder sought to "prevent the directors" of a "Missouri corporation" from "doing an act . . . alleged to be contrary to their duty . . . [under] laws of Missouri." *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 214 (1921) (Holmes, J., dissenting). The corporation sought to "invest[] the funds of the company in farm loan bonds issued by [federal authorities] under authority of [a federal statute]." *Id.* at 195 (majority opinion). The plaintiff alleged that the statute was unconstitutional, giving rise to a state-law breach of duty claim. *Id.* at 195–96. Because the decision "depend[ed] upon the determination" of the "constitutional validity of an act of Congress," the majority found subject-matter jurisdiction. *Id.* at 201–02. Justice Holmes, citing his *American Well Works* opinion, dissented, declaring that "a suit cannot be said to arise under any other law than that which creates the cause of action," and ultimately concluding that Smith's claim arose from Missouri law. *Id.* at 214–15 (Holmes, J., dissenting).

federal cause of action is not fatal and some courts have observed Justice Holmes' test is not "useful for . . . the exclusion for which it was intended." *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 (2d Cir. 1964) (Friendly, J.). Although the test is "more useful" as a rule of *inclusion*, *see Franchise Tax Bd.*, 463 U.S. at 9; *see also Merrell Dow*, 478 U.S. at 814 n.12 (Holmes test is "usual[ly] reliabl[e] . . . as an inclusionary principle"), that notion "is not without its exceptions," *Rogers v. Platt*, 814 F.2d 683, 688 (D.C. Cir. 1987).

For example, the Supreme Court "has sometimes found that *formally* federal causes of action were not properly brought under federal-question jurisdiction because of the overwhelming predominance of state-law issues." *Merrell Dow*, 478 U.S. at 814 n.12 (emphasis added). Probably the most prominent example is *Shoshone Mining Co. v. Rutter*, 177 U.S. 505 (1900), in which case a federal statute authorized suit brought to "determine the question of the right of possession" to "mineral lands." *Id.* at 507, 510. The existence of the right of possession, however, was to "be determined by 'local customs of rules of miners . . . or 'by the statute of limitations for mining claims of the state or territory where the same may be situated.' " *Id.* at 508. Because "[t]he recognition by Congress of local customs and statutory provisions as at times controlling the right of possession does not incorporate them into the body of Federal law," a suit to "determine the right of possession may not involve any question as to the construction or effect of the . . . laws of the United States"; on the contrary, it may involve no more than "determination of the meaning and effect of certain local rules . . . or the effect of state statutes." *Id.* at 508–09. Although the case included the "*right* of possession," *id.* at 507 (emphasis added), and its corresponding federal recognition via "title from the [federal] government," *id.* at

513, the Court found no subject matter jurisdiction. It concluded that notwithstanding a right may have "its origin in the laws of the United States," it may *not*, in the language of section 1331, "necessarily [involve a claim] *arising under . . .* laws of the United States." *Id.* at 507 (emphasis added). If a federal statute specifies that state law governs the existence and scope of a right, and compliance with state law is the only disputed issue, no federal question arises and therefore no subject-matter jurisdiction exists under section 1331. *Cf. id.* at 507 ("The suit *must*, in part at least, arise out of a controversy between the parties in regard to the operation and effect of the Constitution or laws [of the United States]." (emphasis added)).

Assuming, as the majority concludes, that section 1983 establishes a cause of action to enforce the LEOSA, *i.e.*, that it "creates [a] claim for relief," *Mims*, 132 S. Ct. at 748 n.8, I nonetheless believe that, under *Shoshone*, the district court lacked subject-matter jurisdiction. The majority's conclusion establishes only that the LEOSA and section 1983 combine to "authoriz[e] an action to establish a right"—no more, no less. *Shoshone*, 177 U.S. at 510. But state law governs whether "a right" exists and, for subject-matter jurisdiction to arise, "the [federal] Act"—here, the LEOSA—must also "supply the governing law." *Mims*, 132 S. Ct. at 748 n.8. Although the LEOSA may do so in *some* cases, *cf. Shoshone*, 177 U.S. at 513 ("these suits may *sometimes* so present questions arising under the Constitution or laws of the United States that the Federal courts will have jurisdiction" (emphasis added)), it does not do so here.

The plaintiffs seek "an Order directing the District . . . to certify and/or acknowledge Plaintiffs as retired law enforcement officers for purposes of the [LEOSA]," Corr. Am. Compl. 17, which, in this case, turns on whether, while

serving as corrections officers, they had a "statutory power[] of arrest" under D.C. law, *see* Maj. Op at 6; 18 U.S.C. § 926C(c)(2). No one may carry a concealed weapon under the LEOSA unless he "had statutory powers of arrest" before separation from service. 18 U.S.C. § 926C(c)(2). Because the plaintiffs were D.C. corrections officers, D.C. law provided the authority under which they exercised their powers. Accordingly, whether they possess any right under the LEOSA depends on a "determination of local rules and customs, or state statutes, or even only a mere matter of fact." *Shoshone*, 177 U.S. at 508. In support of their authority the plaintiffs allege that D.C. Code § 24-405[2] provided them a "statutory power[] of arrest." The District responds that section 24-405 confers authority to execute only a limited type of warrant, not a "statutory power[] of arrest," relying on, *inter alia*, a D.C. Court of Appeals decision interpreting "arrest" to require an officer's independent decision regarding whether to charge a suspect with a criminal offense. Appellee Br. 22–23 (citing *In re M.E.B.*, 638 A.2d 1123 (D.C. 1993)). Plainly, then, at least to me, this suit "involve[s] no controversy as to the scope and effect of" federal law, rather, the merits outcome turns on application of "local rules" and "the effect of state statutes." *Shoshone*, 177 U.S. at 509, 510.

My colleagues offer two additional bases for subject-matter jurisdiction. First, they emphasize the Congress's "use[] [of] categorical language in the 'notwithstanding'

---

[2] D.C. Code § 24–405 provides that "[a]ny officer of the District of Columbia penal institutions . . . is authorized and required to execute" a warrant "for the retaking of" "a prisoner [who] has violated his parole" "by taking such prisoner and returning or removing him to the penal institution of the District of Columbia from which he was paroled or to such penal or correctional institution as may be designated by the Attorney General of the United States."

6

clause of subsection (a)," Maj Op. 10; *see* 18 U.S.C. § 926C(a) ("Notwithstanding any other provision of the law of any State . . . an individual who is a qualified retired law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm.") and posit that the District took "unlawful action," Maj. Op. 15, to deny the plaintiffs their alleged right. The plaintiffs claim error in the District's decision that they do not meet the state law condition precedent *that the LEOSA requires—i.e.*, that they do not possess a "statutory power[] of arrest," 18 U.S.C. § 926C(c)(2). The "notwithstanding" proviso is not implicated. In any event, the proviso itself is limited to "a *qualified* retired law enforcement officer," which prerequisite is determined by reference to D.C. law. *Id.* § 926C(a) (emphasis added).

In addition, my colleagues conclude—as part of their *Blessing*[3] inquiry—that the District misinterpreted the term "statutory powers of arrest," *see* Maj. Op. 11, specifically, that it "reevaluat[ed] or redefin[ed] [the] federal requirement[]," *id*. at 15; *see also id.* at 19 (District has no power "to revise the statutory definition"), concluding that the existence of a *state* "statutory power of arrest" is a *federal* question, *id.* at 15 ("right defined by federal law"). I do not see how. As they concede, the inquiry whether "the officer had a statutory power of arrest" is "answer[ed]" by "the officer's personnel records and the statutes in effect before the officer retired," *id.* at 12, in other words, by "state statutes, or even only a mere matter of fact," *Shoshone*, 177 U.S. at 508. They apparently also believe that the definition of "arrest" is itself found in federal law and that the term should be construed "broadly," Maj. Op. 11, but in doing so they offer no definition at all. The fact is that the plaintiffs' arrest power

---

[3] *Blessing v. Freestone*, 520 U.S. 329 (1997).

can *only* arise under local law and, in my view, whether the plaintiffs possessed the arrest power under the D.C. definition of that term decides this case. In any event, "[t]he inquiry along Federal lines," to the extent there is one, "is only incidental to a determination of the local question of what the state has . . . prescribed." *Shoshone*, 177 U.S. at 509.[4]

Finally, *Blessing* illustrates what this case is *not* about, at least for the purpose of subject-matter jurisdiction. 520 U.S. 329. *Blessing* involved a federal program that provided funds to states operating federally-qualified child support enforcement programs. *Id.* at 333. A participating state was required to "structure" its implementing agency in a particular way, staff its units at federally mandated levels, and "set up computer systems that met numerous federal specifications" to "maintain detailed records." *Id.* at 334. The plaintiffs alleged that Arizona deprived them of child support services because the state agency's "structural defects" made them ineligible to receive the federal program's benefits. *Id.* at 337. In other words, they alleged that Arizona had not

---

[4] My colleagues submit that the District "acknowledged in official Departmental identification cards that appellants . . . had a power of arrest" but that the District "change[d] its position" "only when appellants . . . sought to exercise their concealed-carry right." Maj. Op. 17 (citing plaintiffs' complaint). The full extent of the District's purported "acknowledg[ment]" is the fact that, before retiring, the corrections officers carried identification cards that referenced D.C. Code § 24–405. Whatever the significance of the identification card, it is irrelevant in determining subject-matter jurisdiction. My colleagues believe that the District got the local law question wrong—pointing to the identification card as evidence. But whether the District misinterpreted its own former officers' authority is not a *federal* question, no matter how badly it erred. In concluding otherwise they misread not only the LEOSA but also *Shoshone*'s reach.

complied with federal requirements. By contrast, here the plaintiffs do not claim that the District's implementation of the LEOSA is lacking nor that the District has failed to meet federal requirements. Instead, they claim that D.C. misinterpreted the authority of its *own* former law enforcement officers under D.C. law, as the LEOSA instructs. Appellant Br. 19 (arguing that the District wrongly concluded "that correctional officers do not have 'law enforcement status and arrest authority' under D.C. law"); *see also* Corr. Am. Compl. ¶ 61; 18 U.S.C. § 926C(c)(2).

I note that some regard subject-matter jurisdiction under section 1331 to be, at bottom, a question of congressional intent and that *Shoshone*, because it involved a local land dispute, can be explained in this way. *See Merrell Dow*, 478 U.S. at 810, 814 n.12 (section 1331 "require[s] sensitive judgments about congressional intent" and *Shoshone* was suit with insufficient "federal interest"); *see also Shoshone*, 177 U.S. at 506 ("[t]he question . . . is not one of the power of Congress, but of its intent"). To me, it makes perfect sense to likewise conclude that the Congress intended a state court to determine whether one of its retired law enforcement officers is "qualified," that is, whether he possessed certain state law authority, *see* 18 U.S.C. § 926C(c)(1), (2), (3), so that he can obtain a state-issued certification, *id.* § 926C(d), a condition precedent of LEOSA's authorization to carry a concealed weapon.

For the foregoing reasons, I respectfully dissent.